778 F.2d 1402
 23 ERC 2097, 16 Envtl. L. Rep. 20,263
 CITY OF TENAKEE SPRINGS and Southeast Alaska Conservation
Council, Inc., Plaintiffs-Appellants,
v.
John BLOCK, Secretary of Agriculture; Max Peterson, Chief,
United States Forest Service; John Sandor,
Regional Forester; and William Gee,
Forest Supervisor, Defendants-Appellees,
and
Alaska Lumber & Pulp Co., Inc., and Larrabee Logging
Company, Intervenors-Defendants-Appellees.
 No. 84-3883.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 5, 1985.
Decided Dec. 20, 1985.
 
 Richard M. Burnham, Findley & Burnham, Juneau, Alaska, for plaintiffs-appellants.
 James F. Clark, Robertson, Monagle, Eastaugh & Bradley, Juneau, Alaska, David C. Shilton, U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.
 Appeal from the United States District Court for the District of Alaska.
 Before Chief Judge BROWNING, GOODWIN and SKOPIL, Circuit Judges.
 GOODWIN, Circuit Judge.
 
 
 1
 Plaintiffs seek to enjoin construction of an 11-mile road through the Kadashan watershed of Chichagof Island in southeastern Alaska. The City of Tenakee Springs and the Southeast Alaska Conservation Council allege that the United States Forest Service has not adequately considered environmental impacts of the road construction as required by the National Environmental Policy Act (NEPA), 42 U.S.C. Secs. 4321-4361 (1982). The district court denied the City's motion for a preliminary injunction. We enjoined construction pending our decision. Because the district court relied on several erroneous legal premises when it denied the preliminary injunction, we reverse and remand.
 
 
 2
 The Kadashan watershed is an undisturbed 33,641-acre forest in the Tongass National Forest which contains over 17,000 acres of commercial forest land. The watershed contains a high concentration of waterfowl and other wildlife and is among the most important fish habitats in southeastern Alaska.
 
 
 3
 As part of its comprehensive management of the Tongass National Forest, in 1979 the Forest Service issued the Tongass Land Management Plan (Tongass Plan) with a programmatic Environmental Impact Statement (EIS) covering land use for the entire 15-million-acre Tongass National Forest for a ten-year period.[1] The Tongass Plan designates certain undeveloped land within the Forest as wilderness in accord with the Forest Service's nationwide Second Roadless Area Review and Evaluation (RARE II),[2] see generally, California v. Block, 690 F.2d 753, 758 (9th Cir.1982), and provides management directions for nonwilderness land. The Tongass Plan divides nonwilderness land into three categories depending upon whether primitive, environmentally compatible, or intensive development is permitted. In the Kadashan watershed, the Tongass Plan allows for environmentally compatible development, which includes logging, roads, and recreational facilities which do not destroy biological and aesthetic resources.
 
 
 4
 The Alaska Lumber & Pulp Company has a fifty-year contract with the Forest Service for harvesting timber in parts of southeastern Alaska including the Kadashan area. Under the contract, logging activities are broken into five-year operating plans. The operating plans are considered to be major federal actions under NEPA, requiring preparation of an EIS. See 40 C.F.R. Sec. 1508.18. In 1980, the Forest Service issued a site-specific EIS detailing the Alaska Lumber & Pulp operating plan for 1981-86; it recommended the deferral of logging but the construction of roads for future logging in Kadashan. In December 1983, the Forest Service contracted with Larrabee Logging Co. to build a new Kadashan road and to reconstruct portions of existing connecting roads in the area.
 
 
 5
 The City of Tenakee Springs and the Southeast Alaska Conservation Council brought this action under NEPA to enjoin construction of the new Kadashan road. Alaska Lumber & Pulp and Larrabee intervened as defendants. The district court denied the preliminary injunction based upon two conclusions of law. First, the court held that section 708 of the Alaska National Interest Lands Conservation Act (Alaska Lands Act), Pub.L. No. 96-487, 94 Stat. 2371, 2421 (1980), foreclosed its review of the adequacy or specificity of the Tongass Plan EIS. Second, the court refused to examine the specificity of the Alaska Lumber & Pulp EIS,[3] holding that the Forest Service had the discretion to determine the specificity of the EIS based upon its own definition of the scope of its action.
 
 
 6
 This court will reverse the district court's denial of the preliminary injunction if we find that the district court relied on an erroneous legal premise in applying the appropriate legal standard. American Motorcyclist Association v. Watt, 714 F.2d 962, 965 (9th Cir.1983). We review de novo the two legal premises upon which the district court based its decision. United States v. Oregon, 718 F.2d 299, 303 & n. 5 (9th Cir.1983).
 
 I. PROGRAMMATIC TONGASS PLAN EIS
 
 7
 In the late-1970s, Congress debated legislation designed to determine how the vast federal lands in Alaska were to be used and to identify those Alaskan lands which were to be incorporated in the various federal land protection systems. This legislation, which became the Alaska Lands Act, added significant Alaskan lands to the National Wilderness System. See 16 U.S.C. Sec. 1132 (1980).
 
 
 8
 At the time that Congress debated the Alaska Lands Act, the Forest Service had just completed its second nationwide Roadless Area Review and Evaluation, in which it designated undisturbed areas of National Forests throughout the country as wilderness, areas needing further planning, or nonwilderness. This process included designation of wilderness lands in parts of Alaska. See RARE II Final EIS Appendix A.
 
 
 9
 Just as it prepared an EIS on the Tongass Plan, the Forest Service prepared a nationwide EIS on RARE II. Although the RARE II EIS evaluated the environmental impact of the wilderness designations, the document did not evaluate the environmental impact of wilderness designations in Alaska's Tongass National Forest. Instead, the RARE II EIS relied upon the separate substantive Tongass Plan EIS which was to be completed almost simultaneously. The RARE II EIS explained:
 
 
 10
 Evaluation of roadless areas on the Tongass National Forest was underway as part of the [Tongass Plan] when RARE II began. The analysis included in the draft environmental statement for [the Tongass Plan has] ... been used to reach the decisions included in this statement.... Rationale for the Tongass decisions are amplified in a final environmental statement for the [Tongass Plan] to be issued in the next several weeks.
 
 
 11
 RARE II Final EIS at 8.
 
 
 12
 As a compromise between logging and environmental interests, the Alaska Lands Act was to be the final word on what land in Alaska was to remain wilderness and what land was to be open to further development. Congress wished to ensure that environmental challenges to the RARE II process would not also threaten the land use compromises in the Alaska Lands Act. See 127 Cong.Rec. 29390 (1981) (statement of Sen. Tsongas) (post-enactment statement); S.Rep. No. 413, 96th Cong. 1st Sess. 397 (1979), U.S.Code Cong. & Admin.News 1980, pp. 5070, 5338 (additional views of Sens. Metzenbaum and Tsongas). Congress' concern to avoid litigation over RARE II as it affected Alaska turned out to be well-founded. See e.g., Block, 690 F.2d 753; Sierra Club v. Peterson, 717 F.2d 1409 (D.C.Cir.1983). Accordingly, an amendment was added to the proposed legislation which eventually became section 708 of the Act. Congress directed that:
 
 
 13
 without passing on the question of the legal and factual sufficiency of the RARE II Final Environmental Statement (dated January 1979) with respect to national forest lands in States other than Alaska, such statement shall not be subject to judicial review with respect to National Forest System lands in the State of Alaska.
 
 
 14
 Alaska Lands Act Sec. 708(b)(1).
 
 
 15
 The district court held that, because the RARE II EIS incorporates by reference the Tongass Plan EIS, the effect of this language is to immunize both the RARE II EIS and the Tongass Plan EIS from judicial review. The court therefore held that the Tongass Plan designation of the Kadashan area as nonwilderness suitable for environmentally compatible development and the specific development plans for the Kadashan basin were unreviewable. This conclusion was in error.
 
 
 16
 Although the RARE II EIS relies upon the substantive analysis in the Tongass Plan EIS, the two are distinct documents. The RARE II EIS addresses only the environmental impact of allocating certain lands to wilderness status. The EIS defers planning for the management of nonwilderness areas until such time as those areas are covered by detailed resource management plans. RARE II Final EIS at v, 39. See Block, 690 F.2d at 762. See also Thomas v. Peterson, 753 F.2d 754, 761, n. 4 (9th Cir.1985). In contrast, the Tongass Plan is more detailed, comprehensive and location-specific than RARE II. Not only does the Tongass Plan, like RARE II, designate certain lands as wilderness, but it also assigns nonwilderness land to one of three specific land use designations. Consequently, while the Tongass Plan recognizes the RARE II wilderness designations, it provides a comprehensive management plan for all lands--wilderness and nonwilderness--in the Tongass Forest. See Tongass Plan Final EIS, Vol. 1 at 4-6 (comparing and contrasting the RARE II and Tongass Plan processes).
 
 
 17
 The language of the remaining three subsections of Sec. 708(b) shows that Sec. 708(b)(1) immunizes from judicial review only the wilderness/nonwilderness allocations made by RARE II and not the detailed Tongass Plan allocations of nonwilderness areas as suitable for primitive, environmentally compatible, or intensive development.
 
 Section 708(b)(2) provides that RARE II
 
 18
 shall be deemed for the purposes of the initial land management plans ... an adequate consideration of the suitability of [National Forest lands in Alaska] for inclusion in the National Wilderness Preservation System and the Department of Agriculture shall not be required to review the wilderness option prior to the revision of the initial plans....
 
 
 19
 Section 708(b)(3) provides that areas "not designated as wilderness ... need not be managed for the purpose of protecting their suitability for [future] wilderness designation...." Section 708(b)(4) prohibits any further review of National Forests in Alaska "for the purpose of determining their suitability for inclusion in the National Wilderness Preservation System." The reference in all four subsections of Sec. 708(b) to management or designation of only wilderness lands is consistent with the Sec. 708(b)(1) reference to RARE II EIS, which also purported only to discuss wilderness lands. Cf. Block, 690 F.2d at 762-63 (suggesting that the RARE II EIS was defective for its failure to discuss nonwilderness lands).
 
 
 20
 The Alaska Lands Act legislative history further supports the conclusion that Congress did not intend Sec. 708 to immunize nonwilderness management plans from judicial review. The Alaska Lands Act refers only to RARE II because Congress was concerned only with the distinction between wilderness and nonwilderness lands. See 127 Cong.Rec. S-14324 (daily ed. Dec. 2, 1981). Representative Morris Udall, a primary sponsor of the Act described section 708 as "rul[ing] on the legal sufficiency of the [Tongass Plan] consideration of wilderness allocations for the Tongass." 126 Cong.Rec. H-10544 (daily ed. Nov. 12, 1980) (emphasis added). See Alaska National Interest Lands Conservation Act of 1979: Hearings Before the House Committee on Interior and Insular Affairs, 96th Cong. 1st Sess. 892 (1979) (statement of Sen. Stevens) (the Tongass Plan "will give Congress the information it needs regarding the effect of potential wilderness designations"). Moreover, at the time that Congress considered the Act, although RARE II provided a comprehensive plan for all Alaskan wilderness lands, the Tongass Plan was the only plan which addressed land use for any Alaskan nonwilderness lands. If Sec. 708 were read to immunize both wilderness and nonwilderness plans, Congress would have ratified for nonwilderness lands plans which did not exist and were not contemplated at the time. Even the Tongass Plan, to which Congressional debate makes reference, was only in draft form when the RARE II EIS was issued and did not yet recommend what intensity of development would be appropriate in particular nonwilderness locations. See S.Rep. No. 96-413 at 228-29, U.S.Code Cong. & Admin.News 1980, pp. 5172-73.
 
 
 21
 The district court held that Congress' approval of the RARE II EIS precluded it from evaluating the adequacy of the decision "whether to build roads and log" and limited it to analyzing the agency's decision of "how to do it." (Emphasis original.) The court also held that "Congress has precluded this court from determining that there was not a sufficiently detailed discussion of the effect of logging and roads." In so limiting the scope of its inquiry, the court erred in reading Sec. 708(b)(1) too broadly.
 
 
 22
 The Tongass Plan is a programmatic EIS. It provides management direction and general guidelines for the Tongass Forest. The EIS itself acknowledges that it is not site specific. Furthermore, the Tongass Plan EIS states that areas not allocated to wilderness are merely recommended for multiple uses. These recommendations are not mandates in part because the "no action" alternative still exists for these areas.
 
 
 23
 Moreover, the site specificity of the Tongass Plan EIS has never been addressed by either Congress or the courts. Notwithstanding this court's opinion in Block, 690 F.2d at 761, Congress did not conclude that either the RARE II EIS or the Tongass Plan EIS was adequately site specific in its discussion of whether or how to develop the Tongass lands. Congress could not have intended to ratify the Block site specificity requirement because that decision came more than two years after Congress debated Alaska Lands Act. Consequently, the district court erred in concluding that the Tongass Plan EIS is sufficient if it discusses how to build roads without discussing whether to build roads.
 
 II. SITE-SPECIFIC EIS
 
 24
 Having concluded that Congress ratified the Tongass Plan EIS only insofar as it distinguishes between wilderness and nonwilderness lands, we consider whether the district court correctly held that the Alaska Lumber & Pulp EIS was satisfactory because "the agency has discretion in defining the scope or parameters of an agency action," and may determine the specificity of its EIS. NEPA requires "a detailed statement," 42 U.S.C. Sec. 4332(2)(C), sufficient "to give to decision makers ... removed from the initial decision sufficient data from which to draw their own conclusions." Coalition for Canyon Preservation v. Bowers, 632 F.2d 774, 782 (9th Cir.1980). The specificity that NEPA requires of an EIS is independent of the scope of the EIS. Block, 690 F.2d at 765; Cady v. Morton, 527 F.2d 786, 795 (9th Cir.1975); cf. Sierra Club v. Peterson, 717 F.2d at 1414-15.
 
 
 25
 Where there are large-scale plans for regional development, NEPA requires both a programmatic and a site-specific EIS. 40 C.F.R. Sec. 1508.28, 1502.20 (1983); Kleppe v. Sierra Club, 427 U.S. 390, 409-14, 96 S.Ct. 2718, 2729-37, 49 L.Ed.2d 576 (1976); see also Council for Environmental Quality, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," 46 Fed.Reg. 18,026, 18,033 (Mar. 23, 1981). Although the agency does have discretion to define the scope of its actions, Block, 690 F.2d at 765, such discretion does not allow the agency to determine the specificity required by NEPA. The district court thus erred when it ruled that the Forest Service had discretion to determine the specificity of the EIS for the five-year Alaska Lumber & Pulp plan for the Kadashan.
 
 III. CONCLUSION
 
 26
 Because the district court relied upon two erroneous legal premises, it erred in denying the City's motion for a preliminary injunction. Interim injunctive relief is granted on grounds similar to that governing the issuance of a preliminary injunction. See Lopez v. Heckler, 713 F.2d 1432, 1435 (9th Cir.), rev'd on other grounds, 463 U.S. 1328, 104 S.Ct. 10, 77 L.Ed.2d 1431 (1983). There are two alternate tests, one of which must be met in order to grant a preliminary injunction. The first test requires that a court find (1) the moving party will suffer irreparable injury if the injunctive relief is not granted; (2) there is a substantial likelihood that the moving party will succeed on the merits; (3) in balancing the equities the nonmoving party will not be harmed more than the moving party is helped; and (4) granting injunctive relief is in the public interest. Martin v. International Olympic Committee, 740 F.2d 670, 674-75 (9th Cir.1984). The second test requires the moving party to demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardship tips sharply in his favor. Id. at 675. These two tests are not separate; they are the outer reaches of a single continuum. Lopez, 713 F.2d at 1435.
 
 
 27
 If we apply the second alternative of the second test, the balance of hardships tips decidedly in favor of the City. See American Motorcyclist Ass'n v. Watt, 714 F.2d at 965-66 (liberal standard for granting an injunction under NEPA because irreparable injury can often be inferred); see also Save Our Ecosystems v. Clark, 747 F.2d 1240, 1250 (9th Cir.1984) (irreparable injury may be presumed when NEPA violation found).
 
 
 28
 It is also clear that serious questions are raised. The Alaska Lumber & Pulp Company has a fifty-year contract, initiated in 1956, with the United States Forest Service. The contract provides that Alaska Lumber & Pulp may harvest timber primarily on the Baranof Islands and parts of the Chichagof Island, where the Kadashan Watershed is located. These forest areas cover approximately 750,000 acres. The contract specifies that, beginning in 1971, timber harvesting would be divided into operating periods of five years. For each operating period, logging units would be selected within the forest, main roads would be specified, and stumpage rates would be redetermined.
 
 
 29
 The five-year operating plan is considered a major federal action under NEPA. It requires preparation of an EIS. 40 C.F.R. Sec. 1502.3 (1979). An EIS was drafted for the operating period 1981-86 and was made available for public comment on September 1, 1979. The draft EIS indicated that timber might be harvested and roads might be built in the Kadashan Watershed. Public comment revealed strong opposition to timber harvesting. Consequently the final EIS, issued in 1980, specified no timber harvesting in the Kadashan Watershed in the years 1981 through 1986. Alaska Lumber & Pulp has also indicated that timber harvesting in the Kadashan Watershed during the subsequent five-year operating plan covering the years 1986-91 is unlikely. The final EIS did state, however, that "pre-roading" would occur in the Kadashan area during the 1981-86 operating plan. Pre-roading was not mentioned in Alaska Lumber & Pulp's draft EIS. The final EIS indicates the pre-roading is necessary for making a particular area ready to be harvested.
 
 
 30
 Neither the Alaska Lumber & Pulp draft nor final EIS for the operating period 1981-86 gave any indication of its overall plan for timber harvesting in the Baranof Islands and Chichagof Island. It is impossible to determine where and when harvesting will occur on the 750,000 acres of land. "The location, the timing, or other aspects of the timber sales, or even the decision whether to sell any timber at all affects the locating, routing, construction techniques, and other aspects of the road, or even the need for its construction." Thomas, 753 F.2d at 760 (discussing the adequacy of piecemeal EIS's). As the record now stands, the Alaska Lumber & Pulp final EIS is inadequate.
 
 
 31
 Reversed and remanded with instructions to enter a preliminary injunction pending further proceedings.
 
 
 32
 SKOPIL, Circuit Judge, specially concurring.
 
 
 33
 The City of Tenakee Springs and the Southeast Alaska Conservation Council appeal the denial of a preliminary injunction. The majority finds that the district court misinterpreted the Alaska National Interest Lands Conservation Act, Pub.L. No. 96-487 (1980) ("ANILCA"), thereby incorrectly concluding that the Forest Service had discretion in defining the scope or parameter of an EIS. I agree with the majority that the district court relied on two erroneous legal premises in denying the preliminary injunction. I also agree that remand is necessary. I disagree, however, with the majority's reasoning and therefore specially concur.
 
 
 34
 Scope of ANILCA Sec. 708.
 
 
 35
 As stated by the majority, at approximately the same time the United States Forest Service was completing roadless area review evaluations, Congress passed ANILCA. In section 708(a) of ANILCA, Congress noted that the Forest Service had completed RARE II. Congress announced that it had conducted its own review and examination of the national forest system roadless areas in Alaska "and of the environmental impacts associated with alternative allocations of such areas." Section 708(a)(2) (emphasis added). On the basis of that review, Congress directed in section 708(b) that:
 
 
 36
 (1) without passing on the question of the legal and factual sufficiency of the RARE II Final Environmental Statement (dated January 1979) with respect to national forest lands in States other than Alaska, such statement shall not be subject to judicial review with respect to National Forest System lands in the State of Alaska; ....
 
 
 37
 1980 U.S.Code Cong. & Admin.News (94 Stat.) 2421-22 (emphasis added).
 
 
 38
 Tenakee Springs argues the district court incorrectly interpreted the scope of ANILCA, resulting in an erroneous conclusion that it could not review the Tongass Plan EIS or the Alaska Lumber and Pulp EIS. Tenakee Springs urges us to find that ANILCA only prohibits review of wilderness allocations. It contends that Congress, in passing ANILCA's section 708, merely approved Kadashan being classified as nonwilderness, but did not approve the particular land use designation. Tenakee Springs insists that because we may review the sufficiency of the Tongass Plan's final EIS regarding all nonwilderness designations, we are free to review the sufficiency of any EIS addressing site-specific activity and resulting site-specific environmental impacts.
 
 
 39
 Conversely, appellee Block urges us to adopt the district court's reasoning and conclusion. That is, Congress, in passing section 708, precluded judicial review of not only wilderness and nonwilderness allocations, but also all nonwilderness designations contained in the nonwilderness allocations. Because the Kadashan watershed was assigned a land use designation III, both timber harvesting and road construction would be allowed in the watershed. Therefore, the only decision left to be made after the land use designation was whether the Alaska Lumber and Pulp EIS adequately explored the general means of effectuating the Tongass Plan land use designation. The EIS did not have to consider the site-specific impact of the Kadashan road upon wildlife or other environmental impacts. In the words of the district court, "the EIS contained a reasonably thorough discussion of the area of decision: not whether to build a road and log but how to do it."
 
 
 40
 I neither agree nor fully disagree with either party. First, the district court is correct in concluding that section 708 of ANILCA indeed precludes judicial review of the land use designations found in the Tongass Plan's final EIS. Section 708(a)(2) states that "Congress has made its own review and examination of national forest system roadless areas in Alaska and of the environmental impacts associated with alternative allocations of such areas." (Emphasis added.) Congress could not have reviewed the impacts associated with the alternative allocations made in the Tongass Forest without having reviewed the Tongass Plan EIS. There was no RARE II EIS regarding the Tongass National Forest. The only conclusion that can be reached is that the allocations to which section 708 refers regard both the Tongass Plan land use designations and the RARE II wilderness, nonwilderness, and further planning designations.
 
 
 41
 The majority relies in its conclusion on the fact that the two EISs are different in their analysis and treatment of both wilderness and nonwilderness land. I cannot find the significance of this disparity in the two statements. The Tongass Plan EIS and the RARE II EIS refer to one another and make it clear that while the two statements do not use identical categories, they have identical goals. More important, Congress clearly approved of the Tongass Plan allocations in Alaska. The majority's distinction between wilderness and nonwilderness allocations which it uses to defend its position belies the plain language of section 708(b)(1) which states: "such statement shall not be subject to judicial review with respect to National Forest System lands in the State of Alaska...." (Emphasis added.) There is no qualification with regard to what part of the statement is immune from review. If Congress was concerned that judicial review be available for nonwilderness designations, it could have simply stated that wilderness designations would not be subject to judicial review. Section 708(b)(1) undeniably includes both wilderness and nonwilderness designations.
 
 
 42
 Legislative history indicates congressional approval of the Tongass Plan land use designations. As the majority states, representative Morris Udall stated that section 708, "rules on the legal sufficiency of the Tongass Land Management Plan's consideration of wilderness allocations for the Tongass." 126 Cong.Rec. 29277 (1980). He stated further, "[t]he Forest Service has indeed done a fine job on the plan as adopted in April, 1979...." Id. With regard to timber development provisions of ANILCA's section 705, Congressman Udall stated "we have reviewed the current Tongass Land Management Plan (TLMP) and find it satisfactory." Id.
 
 
 43
 More revealing are Senator Tsongas' comments on section 708, made in 1981. He explained that section 708 was implemented, in part, to protect the timber industry of southeast Alaska. "It effectively guarantees that wilderness advocates cannot delay the implementation of the RARE II review or the Tongass National Forest land management plan through dilatory lawsuits." 127 Cong.Rec. 29390 (1981). His comment would make little sense if section 708 were read to mean that judicial review was allowed for any land use designation but that of wilderness.[1] Wilderness advocates would be much more inclined to bring a cause of action against a nonwilderness land use designation than that of wilderness, thereby engaging in "dilatory lawsuits" meant to be avoided by section 708.
 
 
 44
 Finally, the majority discusses and finds significant the fact that the Tongass Plan was not final at the time Congress considered section 708. At the time Congress considered section 708, the draft Tongass Plan EIS had been issued and was examined by Congress. The final EIS was almost exactly the same as the draft.[2]
 
 
 45
 I do not agree with the district court, however, that "Congress has precluded this court from determining that there was not a sufficiently detailed discussion of the effect of logging and roads on the habitat." The Tongass Plan is a programmatic EIS. It provides management direction and general guidelines for the Tongass Forest. The EIS itself acknowledges that it is not site-specific. Further, it states that the areas not allocated to wilderness are recommended for multiple uses. The land use designations were not mandates. That is, land use designation III does not require, but only allows, timber harvesting and road construction. Therefore, as stated in the Alaska Lumber and Pulp draft EIS, "no action" is an alternative in these areas. Lending support to this argument is the fact that the Forest Service deferred timber harvesting in the Kadashan during the ALP five-year operating plan beginning in 1981. Consequently, the district court's conclusion that an EIS's sufficiency is measured by whether it discussed how to build roads rather than whether to build roads is incorrect. To the contrary, even though we are not free to review the land use designation contained in the programmatic Tongass Plan EIS, we are free to review the site-specific Alaska Lumber and Pulp final EIS to determine whether it is sufficiently site-specific regarding its decision to build the Kadashan road.
 
 
 46
 Therefore, although I do not agree with the majority that the Tongass Plan EIS is subject to judicial review, I do agree that section 708 does not preclude judicial review of the Alaska Lumber and Pulp EIS. I therefore concur in the majority's decision to remand this case.
 
 
 47
 I fully agree with the majority's reasoning regarding the issuance of the preliminary injunction and concur in its instruction to enter a preliminary injunction.
 
 
 
 [1]
 A programmatic environmental impact statement is a broad-based, long-range plan that discusses the overall environmental impacts of a proposed action. National Wildlife Fed. v. United States Forest Service, 592 F.Supp. 931, 940 n. 17 (D.Or.1984)
 
 
 [2]
 By wilderness, we refer to an area designated as such pursuant the 1964 Wilderness Act, 16 U.S.C. Secs. 1131-1136, and required by that Act to be left in its undeveloped state
 
 
 [3]
 The Forest Service argues that Tenakee Springs' appeal is foreclosed by its delay in attacking the draft and final Alaska Lumber & Pulp EIS. They rely upon San Francisco v. United States, 615 F.2d 498, 502-03 (9th Cir.1980), in which this court found that one of the grounds for appealing an agency decision was raised too late. The case the Forest Service cites is inapposite. In San Francisco, the appellant raised an issue that was not raised at the time of the agency decision although it was possible to have raised it. 615 F.2d at 502. See also Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 554-55 and n. 22, 98 S.Ct. 1197, 1217 and n. 22, 55 L.Ed.2d 460 (1978). Tenakee Springs' contention on appeal is that the development alternative chosen by the Forest Service was not included in the draft EIS so Tenakee Springs could not have raised its adequacy in agency proceedings prior to the issuance of the final EIS. Tenakee Springs' objections are, therefore, timely and reviewable
 
 
 [1]
 The majority decision also makes mention of Senator Tsongas' comments. It states that "Congress' concern to avoid litigation over RARE II as it affected Alaska turned out to be well-founded." See majority opinion at 1405. The opinion then cites to California v. Block, 690 F.2d 753 (9th Cir.1982) and Sierra Club v. Peterson, 717 F.2d 1409 (D.C.Cir.1983). The Block decision has nothing to do with RARE II as it affected Alaska. It involved litigation over land in California. The same is true regarding the Peterson decision. That litigation involved land in Idaho and Wyoming
 
 
 [2]
 The majority makes one final argument for its interpretation of ANILCA. It refers to this court's decision in California v. Block, 690 F.2d at 761. See majority opinion at 1406. First, I am somewhat confused at the discussion of the site specificity of the Tongass Plan because we all agree that the Tongass Plan is a programatic EIS. Further, I am uncertain as to the significance of the statement made in the majority opinion that Congress could not have intended to ratify the Block specificity requirement. It is clear that Congress could not have so intended because, as the majority points out, the Block decision followed the enactment of ANILCA. Finally, I do not believe Block has any relevance to congressional intent regarding section 708 of ANILCA