**OREGON NATURAL RESOURCES COUNCIL, et al., Plaintiffs,**

**v.**

**John O. MARSH, Jr., in his official capacity as Secretary of the United States Department of the Army, et al., Defendants.**

**Civ. No. 85–6433–E.**

United States District Court, D. Oregon.

March 3, 1986.

---

Neil S. Kagan, Roseburg, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., Thomas C. Lee, Asst. U.S. Atty., John R. Seeronen, Asst. District Counsel, Army Corps of Engineers, Portland, Or., Dorothy R. Burakreis, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## OPINION AND ORDER

JAMES M. BURNS, District Judge.

## I. INTRODUCTION

Oregon Natural Resources Council (ONRC) brought this action to enjoin the Corps of Engineer's (Corps) construction of a dam at Elk Creek in the Rogue River Basin in Southern Oregon. ONRC sought a preliminary injunction; the Corps opposed this motion, and also responded with a motion for summary judgment.

ONRC initially charged the Corps with violating both the National Environmental Policy Act (NEPA) and the Wild and Scenic Rivers Act (WASRA).[1] Prior to the hearing on the motion for preliminary injunction, ONRC withdrew its WASRA claim.[2] At issue here, therefore, is only whether the Corps violated the requirements of NEPA in the preparation of its Final Environmental Impact Statement Supplement (FEISS) on the Elk Creek project.

A hearing was held on January 16, 1986 at which, after testimony was taken and oral argument had, I gave a brief oral opinion denying ONRC's motion for preliminary injunction. I advised the parties I would issue a written opinion addressing both ONRC's motion for preliminary injunction and the Corps' motion for summary judgment.

## FACTS

The parties have thoroughly canvassed the facts (largely undisputed) of this case. The voluminous administrative record also contains a detailed accounting of the facts.[3] It is, therefore, unnecessary to review the facts in detail for either party's benefit.

---

1. ONRC's complaint also alleges that the Corps violated the Freedom of Information Act relative to ONRC's request for information of the Elk Creek project. That issue is not addressed in this opinion. It will be decided at a later date.

2. WASRA, 16 U.S.C. § 1278, (§ 7(a)), requires the Secretary of the Interior to determine whether a water resources project would have an adverse environmental effect on any river established as a wild and scenic river. The proposed Elk Creek dam is 57 miles upstream from the designated wild and scenic portion of the Rogue River. In accordance with WASRA requirements the Corps notified the Secretary of Interior of the Elk Creek project when the FEISS was complete.

On January 19, 1981 then Secretary of Interior, Cecil Andrus, responded with a letter stating that he had determined "that the project is unsatisfactory from the standpoint of public welfare and environmental quality." After listing nine environmental concerns relative to the dam's construction the Secretary concluded that "the benefits projected to be derived from completion of this project do not justify its completion. Clearly, abandoning this project would be consistent with our national efforts to protect our natural environment and to make wise use of tax dollars derived from all our Nation's citizens." (A.R. 8(a)). ONRC based its WASRA claim on this letter.

ONRC apparently was not, at the time it filed this case, familiar with a follow-up letter of April 2, 1981 from Donald Hodel, then Under/Secretary of the Interior, under James Watt who had replaced Cecil Andrus. In that letter the Under/Secretary stated that the January 19, 1981 letter "may contain serious errors" and "may have been based, at least in part, on inadequate data." Accordingly, he withdrew all comments and conclusions for reevaluation. (A.R. 13).

That letter was followed by a July, 1981 letter which concluded, in part, that "[T]he January 19, 1981 letter from the DOI included criticisms of the project which were either not sustainable on further review, or went beyond responsibilities of the DOI." Thus, the DOI withdrew any criticism of the project. (A.R. 16).

Because the DOI did not determine that the project would have an adverse environmental effect on the wild and scenic portion of the Rogue River, ONRC could not state a claim under § 7(a) of WASRA. Therefore, upon learning of the DOI's withdrawal of objection to the project, ONRC chose not to pursue its WASRA claim. (Plaintiff's Brief in Reply to Defendant's Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction, p. 1. fn. 1.)

3. The Administrative Record (A.R.) is a comprehensive compilation of the documents relevant to the Corps' decisions regarding the proposed Elk Creek project. The entire A.R. is part of the case record filed with the court.

Any reader desiring more detail may consult the entire record filed with the court.

Briefly, the construction of the Elk Creek Dam was authorized in 1962 as part of a three dam Rogue River Basin project. The project's primary purpose was to control flooding in the Rogue River Basin in Southern Oregon. The other two dams, Lost Creek Dam and Applegate Dam, have already been completed.

The Corps completed an Environmental Impact Statement (EIS) on the Elk Creek dam in 1971. After conducting further studies on the turbidity potential of the proposed construction the Corps drafted a supplemental (EISS) in 1975. However, because of controversy over the environmental effects of the project the Governor of Oregon withdrew the state's support and requested that work be suspended until the Corps could evaluate the effects of the Lost Creek dam on the water quality in the Rogue River. The 1975 draft EISS was never finalized.

After studying the water quality effects of the Lost Creek Dam, the Corps prepared another draft EISS in 1980. After public comment and response, that EISS was finalized (FEISS) in December, 1980.

In February, 1982 the Corp issued a Record of Decision for the Dam's construction, subject to Congressional authorization. A § 404 Water Quality study was conducted and completed in October, 1983.[4] Also during that year the dam's structure was redesigned to lower the anticipated water temperatures. An Environmental Assessment (EA), Finding of No Significant Impact (FONSI), and a Supplemental Information Report (SIR) were completed on those changes.

Despite the Division Engineer's Decision of Record recommending construction of the dam, the Corps did not seek funding for it. Nevertheless, in August, 1985, after five years of extensive testimony (before the relevant committees) and study regarding Elk Creek, Congress appropriated moneys and directed the Corps to build the dam.[5] ONRC then filed this suit to enjoin the dam's construction.

## II. DISCUSSION—PRELIMINARY INJUNCTION STANDARDS

This circuit has adopted two alternative tests to determine whether a preliminary injunction should be issued:

The first test requires that a court find 1) the moving party will suffer irreparable injury if the injunctive relief is not granted; 2) there is a substantial likelihood that the moving party will succeed on the merits; 3) in balancing the equi-

---

**4.** Section 404 of the Clean Water Act requires the Corps to evaluate for water quality all projects which will discharge fill material into navigable waters. The Elk Creek § 404 evaluation, along with comments and responses, is set out at A.R. 19–19n.

**5.** Testimony from the hearing conducted by both the House and Senate appropriations Subcommittees on Energy and Water development Appropriations from 1980–85 relative to the Elk Creek project are set out in A.R. 37–47. The Supplemental Appropriations Act, P.L. 99–88, signed by the President August 15, 1985 appropriates funds for the main dam at Elk Creek.

In addition to the appropriations, the Senate Report on the Supplemental Appropriations Bill, S. 99–82, 99th Cong. 1st Sess. 97 (1985) specifically directs that the dam construction begin:

Elk Creek, Or.—The Congress in action on the 1985 Energy and Water appropriations bill, Public Law 98–360 directed the Corps of Engineers to resume construction of the Elk Creek Lake project. Notwithstanding this specific legisla-

tive language, the Corps has not proceeded to carry out the congressional intent on this project.

The Committee notes that the entire $10,000,-000 appropriated in Public Law 98–360 for the Elk Creek Lake, Or. project was used for the award of a lump sum contract for relocation of roads and that none of the appropriated funds have been used for construction of the main dam as envisioned.

The Committee, therefore, has included specific language in the legislation directing the Secretary of the Army, acting through the Chief of Engineers, to award a continuing contract for construction of the main dam for the Elk Creek Lake project, as authorized in Public Law 87–874. To further strengthen this direction and to make absolutely clear the Committee intent, an additional $15,000,000 has been appropriated, to remain available until expended, so there will be no impediment to proceeding of the main dam of the Elk Creek Lake project.

ties the nonmoving party will not be harmed more than the moving party is helped; and 4) granting injunctive relief is in the public interest.... The second test requires the moving party to demonstrate either 1) a combination of probable success on the merits and the possibility of irreparable harm; or 2) that serious questions are raised and the balance of hardships tips sharply in his favor.

*City of Tenakee Springs v. Block,* 778 F.2d 1402, 1407 (9th Cir.1985).

Under either test ONRC must establish a likelihood, or at least serious questions, that the Corps violated NEPA requirements in preparing its final EIS.

"The purpose of NEPA is to assure that federal agencies are fully aware of the impact of their decision on the environment." *Friends of the Endangered Species v. Jantzen,* 760 F.2d 976, 985 (9th Cir.1985). To satisfy this purpose, NEPA requires that federal agencies undertaking projects with significant environmental consequences must identify and discuss all those foreseeable environmental consequences in an EIS. 42 U.S.C. § 4332.[6]

■■■ An EIS serves two basic purposes. It a) "should provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in light of its environmental consequences" and b) "the impact statement should provide the public with information on the environmental impact of a proposed project as well as encourage public participation in the development of that information." *Trout Unlimited, Inc. v. Morton,* 509 F.2d 1276 (9th Cir.1974).

■■■ In reviewing an agency's compliance with NEPA I am required to employ a "rule of reason" that inquires whether an EIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Trout Unlimited, Inc. v. Morton,* 509 F.2d 1276, 1283 (9th Cir. 1974). This standard is not susceptible to refined calibration. It instead requires a reviewing court to make a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation. *Warm Springs Dam Task Force v. Gribble,* 565 F.2d 549, 552 (9th Cir.1977) (per curiam); *Trout Unlimited, Inc.,* 509 F.2d at 1283. This standard of review, however, does not authorize a reviewing court to substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action. Once satisfied that a proposing agency has taken a "hard look" at the decisions environmental consequences, the review is at an end. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976).

*California v. Block,* 690 F.2d 753, 761 (9th Cir.1982).

In this case, to state it in over-simplified fashion, I should enjoin construction of Elk Creek Dam only if the Corps has not taken a "hard look" at it.

ONRC claims that the Corps has violated NEPA by 1) failing to consider the cumulative effects of the Rogue River Basin Project in a single EIS; 2) failing to ade-

---

**6.** Section 102 of NEPA, 42 U.S.C. § 4332, states in part:

The Congress authorizes and directs that, to the fullest extent possible: (2) all agencies of the Federal Government shall—

 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

 (i) the environmental impact of the proposed action;

 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented;

 (iii) alternatives to the proposed action;

 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

quately describe the area affected by the project; 3) failing to adequately describe the environmental consequences of the project; 4) failing to provide a clear basis for choice among reasonable alternatives; 5) failing to comply with their disclosure and research duties under the worst case analysis; and 6) failing to prepare a new supplemental EIS. ONRC's claims are all rejected.

### A. *Cumulative Impact*

■ ONRC first claims that the Corps has not adequately considered the cumulative impact of the Elk Creek Dam in conjunction with the rest of the Rogue River Basin Project.

The cumulative impact is "the impact on the environment which results from the incremental impact of an action when added to the other past, present and foreseeable future actions regardless of what agency or person undertakes such actions." 40 C.F.R. § 1508.7. ONRC argues that the cumulative impacts of the three dam Rogue River Basin Project must now be considered in a single EIS. I disagree.

In a prospective project consisting of connected, dependent actions, a single EIS is necessary to adequately assess the cumulative impact of the entire project. *See Northwest Indian Cemetery Protective Association v. Peterson,* 764 F.2d 581 (9th Cir.1985). (EIS which did not address the cumulative effects of a proposed road construction project and related timber harvesting project on water quality was inadequate); and *Thomas v. Peterson,* 753 F.2d 754, (9th Cir.1985). (Where "timber sales cannot proceed without the road, and the road would not be built without the contemplated timber sales", EIS which did not address the cumulative impact of the two proposed projects was inadequate. *Id.* at 758.)

However, the Rogue River Basin Project is nearly complete. To retrospectively compile a single EIS on the entire project would be illogical.[7] Rather, the more valuable tool in assessing the environmental consequences of the proposed Elk Creek Dam is an analysis of the cumulative impact of this dam when added to the existing components of the project. The Corps has done this.

The FEISS describes and analyzes the Elk Creek Dam as the third and final step in the Rogue River Basin Project. Integral to the description of the construction and operation of the Elk Creek portion of the project is its interrelationship with the other dams in the project. Likewise, the environmental impacts to the water quality, aquatic biology, wildlife and land use of the dam are analyzed in terms of the effects of the entire project. I am convinced that the Corps took a hard look at the cumulative environmental impacts of the Elk Creek Dam as the last step in the Rogue River Basin project.

### B. *Affected Area*

ONRC next argues that the FEISS is inadequate because it fails to adequately describe the affected area as required by 40 C.F.R. § 1502.15. Specifically ONRC alleges error in the Corps' failure to discuss the proximity of the dam to the Wild and Scenic area of the Rogue River and in the Corps' description of the geology, soils and slope stability in the area around the dam.

■ The EIS must be sufficiently detailed to apprise the substantive decision-makers of the potential environmental consequences of the project. *Trout Unlimited,* 509 F.2d at 1283. The agency's analysis of the affected area should provide the decision-makers with an accurate basis from which to evaluate those consequences.

7. This is not to say that the Corps is in any way relieved from its obligation to continue monitoring the environmental effects of Lost Creek and Applegate Dams and to mitigate environmental harm to the greatest extent possible. However, the nature and purpose of an EIS is prospective: to give the decision makers an adequate and realistic assessment of a proposed action from which they can determine whether to proceed. The purpose of EIS could not be served by compiling such a statement on a completed project.

■ That the Corps did not specify in the body of the FEISS the proximity of the dam to the Wild and Scenic area of the Rogue River, located 57 miles downstream, does not render its analysis inadequate. Based on its water quality studies, the Corps determined that the project's impact on the wild and scenic area, if any, would be insignificant. Thus, the Corps concluded that it was unnecessary to specify the proximity of the Wild and Scenic area in the FEISS.

■ Its proximity to the dam is, nevertheless, discussed in the comment and response section of the FEISS. Thus, even if the Corps erred in not analyzing it in the body of the FEISS, the Corps, as decisionmaker and the Congress as well, was aware of the dam's proximity to the Rogue's Wild and Scenic section when the final decision was made.

■ The FEISS soils description also meets the NEPA requirements. Incorporating the 1975 Rogue Basin Water Temperature and Turbidity Report, which contains an extensive soils analysis, and the 1979 Water Quality Update Study, which identifies and describes the soil types and their susceptibility to slides, the FEISS thoroughly discusses the condition of the soils in the affected area. It also sufficiently recognizes the potential problems in the slope stability and turbidity levels. Criticism of the Corps' analysis is contained in the comment and response section of the FEISS, thereby alerting Congress to the conflict of opinion relative to the soils description. I find that the descriptions show that the Corps took a hard look at the soil conditions and the FEISS descriptions and comments are adequate to apprise Congress of those conditions.

C. *Environmental Consequences*

40 C.F.R. § 1502.16 requires that the EIS contain a discussion of the environmental consequences of the proposed action. The Corps must include in that discussion the indirect effects and their significance, the possible conflicts between the proposed action and other federal mandates and the means to mitigate adverse environmental impacts. ONRC alleges that the Corps has failed to satisfy these requirements.

ONRC alleges that the Corps did not adequately discuss the environmental consequences of the downstream turbidity and its effect on fish production and angling.

■ The Corps' studies on the project's effects on downstream turbidity, including the effects on fish and angling, are documented in the 1974 Rogue River Basin Temperature and Turbidity Report and the 1979 Water Quality Study; and the FEISS. Conflicts of opinion, however, persist. While the Corps is required to identify opposing views found in the comments, so differences of opinion are readily apparent, it is not required to resolve conflicts raised by opposing viewpoints. *California v. Block*, 690 F.2d at 773; *Warm Springs Dam Task Force*, 565 F.2d at 554. That the "EIS promotes both informed decisionmaking and public participation" is the requirement of NEPA. *Enos v. Marsh*, 769 F.2d 1363, 1372 (9th Cir.1985). The Corps' comprehensive study and its recognition of the persisting conflicts satisfy that requirement.

■ ONRC next argues that the Corps failed to discuss the indirect effects and their significance by failing to discuss the relationship between short-term uses of the environment and long-term productivity or any irreversible or irretrievable commitment of resources caused by the project. Chapter 4 of the FEISS, entitled "Environmental Effects of the Proposed Action," adequately addresses these concerns.

■ ONRC also argues that the Corps was required to discuss the possible conflicts between the proposed dam construction and the requirements of WASRA, and that the FEISS was inadequate because of the Corps' failure to do so. I disagree.

As previously discussed, the Corps determined that the dam would not significantly affect the wild and scenic portion of the Rogue River. This conclusion was substantiated when the Secretary of the Interi-

or notified the Corps shortly after the FEISS was completed that the dam would not conflict with the WASRA requirements relative to the wild and scenic portion of the Rogue.[8] Congress was aware of the dam's proximity to the wild and scenic portion of the Rogue and the Corps' failure to examine the environmental consequences of that proximity in the FEISS was not in error.

Finally, ONRC argues that the Corp's mitigation measures are inadequate.

 It is true, as ONRC asserts, that the mere listing of mitigation measures in an EIS is inadequate to satisfy the NEPA requirements. *Northwest Cemetery Protective Association,* 764 F.2d at 588. However, in this case, for every adverse environmental effect the Corps has developed, or is developing, mitigation measures to minimize or alleviate the potential damage.[9]

NEPA does not require that the Corps reject all projects that have any adverse environmental effects, nor does it require the Corps to completely compensate for them. Rather, NEPA requires that the Corps recognize the adverse environmental effects that cannot be avoided and mitigate those effects to the greatest extent possible. *Friends of the Endangered Species v. Jantzen,* 760 F.2d at 987. *See also Sierra Club v. Clark,* 774 F.2d 1406 (9th Cir.1985). I find that the Corps' mitigation plans satisfy that obligation.

8. *See* footnote 2, supra. ·

9. *See e.g.,* discussion of Cole M. River's Fish Hatchery, A.R. 7 at 35 which is designed to mitigate loss of anadromous fish-spawning habitat in Elk Creek, Applegate River and Upper Rogue, and to mitigate lost trout production by providing rainbow trout and kokanee for stocking in reservoirs.

At the preliminary injunction hearing, Ron Garst, Senior Staff Biologist for the U.S. Fish and Wildlife Service, testified that the Corps is interested in wildlife habitat mitigation. USFW is currently assessing loss of wildlife habitat mitigation plan. *See also* Plaintiff's Amended Witness List, Ron Garst testimony summary.

10. 40 C.F.R. § 1502.14 requires, in part that:

**D. Cost-Benefit Ratio**

 ONRC argues that the Corps failed to provide a clear basis for choice among reasonable alternatives as required by 40 C.F.R. § 1502.14.[10] It bases this argument on the Corps' use of the 3¼% interest rate to calculate the cost benefit ratio to the project.

"An EIS cost benefit analysis is sufficient if it gives the decision makers and other readers enough detail concerning all of these costs and benefits [of a proposed project] to permit a reasoned evaluation and decision." *South La. Env. Council v. Sand,* 629 F.2d 1005 (5th Cir.1980).

ONRC correctly explains that "An unreasonable comparison of alternatives does result where an EIS pretends that a cost benefit analysis of the basin project, using an artificially low discount rate represents a realistic assessment of the economic value of the proposed action." (Plaintiff's memorandum in support of motion for preliminary injunction, p. 19, *citing Johnston v. Davis,* 698 F.2d 1088, 1094–95 (10th Cir. 1983)). ONRC then asserts that "the SEIS here pretended that its cost benefit analysis of the basin project, using the same artificially low discount rate, [of 3¼%] represented a realistic assessment of the economic value of the proposed action. And, as in *Johnston v. Davis,* the SEIS suggested without qualification that the project would produce net economic benefits, making no mention of the artificially low discount rate." ONRC's assertion is incorrect.

Based on the information and analysis present in the sections on the Affected Environment (§ 1502.15) and Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decision-maker and the public.

ONRC does not challenge the alternatives the Corps included in its EIS. Rather, ONRC argues that, because of the Corps' reliance on the 3¼% discount rate, it did not provide the decision-makers with a clear basis for choice among the options.

While the Corps used an artificially low discount rate of 3¼%, as required by law,[11] it did not represent that as a realistic assessment of the value of the proposed action. Rather, the Corps also evaluated the project under the currently required 7½% discount rate and included both calculations in an incremental cost-benefit analysis which was included in the FEISS. That cost benefit analysis showed the economic justification for the project was shaky.

Congress was fully aware of the realistic assessment of the economic justification for the project when it directed that the dam be constructed. It is not my role to review or reevaluate Congress' decision. *Enos v. Marsh,* 769 F.2d at 1375.[12] As the 5th Circuit Appeals Court aptly concluded in *Sand:*

> If we were to review the factors of the Corps' economic benefit analysis in the plenary fashion requested by plaintiffs, all chaos would ensue ... Projects such as the one considered here have an extremely long gestation period. This particular project has undergone studies since its inception in 1968. Over time, the economic realities do change. But once Congress has authorized a project, it is not for the courts to review its economic justification. Congress has allowed limited review of such projects under NEPA but we are to evaluate the economic justification only if it has become so flawed that it grossly distorts the environmental consideration... Barring the extreme case, it is for Congress to determine when to reevaluate the economic justification for a particular project. After just such a reevaluation, this project was continued. We refuse to substitute our judgment for that of Congress and the Corps.

*Sand,* 629 F.2d at 1015.

This is not an extreme case. Congress was not misled by the Corps' use of the 3¼% discount rate. The Corps presented Congress with a realistic assessment of the project and a clear basis for choice among reasonable alternatives. Thus, ONRC's allegation is without merit.

### E. Worst Case Analysis

ONRC next argues that the Corps failed to comply with their disclosure and re-

---

11. 42 U.S.C. § 1962d–17(b).

12. In Plaintiff's Brief in Reply to Defendants' Memorandum In Opposition to Plaintiff's Motion for Preliminary Injunction, ONRC argues that *Enos v. Marsh* "is inapposite." ONRC argues that *Enos* holds that "Congressional action upon a specific cost benefit analysis forecloses judicial review of that analysis *but only* for purposes of assessing the agency's compliance with the Water Resources Development Act." (Emphasis added). To support this statement ONRC quotes *Enos* as noting that "violations based upon invalid use of the WRDA discount rate formula under NEPA and WRDA are distinct." ONRC has taken this quote out of context.

In *Enos* the court noted that the "WRDA discount rate formula is applicable to the EIS" but, because they are separate acts, claims of violations of the two Acts must be alleged separately. Enos challenged the 3¼% discount rate in the EIS for the first time on appeal. Therefore the court refused to hear the NEPA claim, noting, as ONRC quoted, that they are distinct violations.

While the WRDA violation was the only one at issue in *Enos* the court did not hold that Congressional action on a cost benefit analysis *only* foreclosed judicial review of WRDA violations. The Enos court stated that "Plaintiff concedes that Congressional action based upon a specific cost benefit analysis forecloses judicial review of that analysis." The Court cited three cases for that proposition: *Izaak Walton League of America v. Marsh,* 655 F.2d 346 (D.C.Cir. cert. denied, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981)); *Environmental Defense Fund Inc. v. Corps of Engineers,* 492 F.2d 1123 (5th Cir.1974); and *South La. Envtl. Council v. Sand,* 629 F.2d 1005 (5th Cir.1980). Two of those three cases (*EDF* and *Sand*) were based on alleged NEPA violations.

Even though the court did not entertain the NEPA challenge on appeal it nevertheless went on to note that "in its 1976 EIS, the Corps also included a cost-benefit ratio based upon the discount rate of 6⅜%, thereby fulfilling the substantive purpose of NEPA to inform the decision-makers and the public of the realistic consequences of agency actions."

The Corp has done essentially the same thing in this case, including a 7½% discount rate in addition to the statutorily required 3¼%. I cannot understand how ONRC can think *Enos* is inapposite. For the principal for which it was cited, it appears to be directly analogous to this situation.

search duties under the worst case analysis regulation.

An agency must conduct a worst case analysis "when the information relevant to the adverse impacts is essential ... and is not known and the overall cost of obtaining it are exorbitant or ... the information ... is important and the means to obtain it are not known." *Save Our Eco-systems v. Clark,* 747 F.2d 1240 (9th Cir. 1984), *citing* 40 C.F.R. § 1502.22.

ONRC argues that this regulation requires the Corps to expose the scientific uncertainty with respect to the downstream turbidity, fish population and fishing, and the uncertainty of the studies results relative to the project's overall turbidity level. I disagree.

The Corps conducted studies on the turbidity potential resulting from the dam using state of the art modelling techniques.[13] The Corps concluded that, from a technical and scientific standpoint, its predictions were reliable. It, therefore, did not indicate a scientific uncertainty or conduct a worst case analysis in its FEISS. The FEISS does, however, include the comments of others who questioned the accuracy of the Corps' testing techniques. If uncertainty does, in fact, exist, these comments in the FEISS expose them. That is what worst case analysis under 40 C.F.R. § 1502.22 requires. The Corps has complied with that requirement.

F. *New Supplemental EIS*

ONRC's final argument is that the Corp violated NEPA by failing to prepare a

**13.** The 1974 Water Quality and Turbidity Study, A.R. 4, vol. 1 at 34 describes how the turbidity measurement is calculated. The Corps used the WESTEX mathematical modelling technique to predict future turbidity potential. *See* A.R. 6, App. C, § 10 for explanation of mathematical modelling. To verify the accuracy of the WESTEX model the Corps studied actual turbidity data from Lost Creek Dam with predicted data from WESTEX. This study resulted in the 1979 Water Quality Update, A.R. 6, App. C.

**14.** Phase I Completion Report, Lost Creek Evaluation (Draft), dated August 3, 1984, A.R. 88, and Final Phase I Report, dated August, 1985,

new supplemental EIS in light of new information acquired since the 1980 FEISS was prepared.

"[A] federal agency has a continuing duty to gather and evaluate new information relevant to the environmental impact of its actions even after the release of its EIS." *Enos v. Marsh,* 769 F.2d at 1373; *Stop H-3 Association v. Dole,* 740 F.2d 1442, 1463 (9th Cir.1984,) *cert. denied* — U.S. ——, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985). The agency must supplement its EIS if "(t)here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed actions or its impacts. 40 C.F.R. § 1502.9(c)(1)(i) and (ii) (1984). An agency's decision not to supplement an EIS in light of new information will be upheld if it is reasonable." *Id., Stop H-3 Association,* 740 F.2d at 1463; *Warm Springs Dam Task Force v. Lieutenant General William C. Gribble,* 621 F.2d 1017 at 1024 (9th Cir.1980).

The new information ONRC asserts justifies a new EIS supplement consists of two studies: Oregon Fish and Wildlife Department an "OFWD" study indicating concerns that the project will reduce fish population and angling opportunities;[14] and a soil survey done by the U.S. Soil Conservation Service.[15]

The Corps has evaluated the draft OFWD study and memoranda by several OFWD biologists regarding this study and has concluded that it did not present new information significant enough to justify a

A.R. 92, completed by ODFW under contract with the Corps. The final report is currently under review by the Corps and outside experts. ONRC's actual reliance in arguing that the Corps must supplement its FEISS is on memoranda of several OFWD biologists who base their concerns on the Phase I Report findings. Exhibit 14 to Plaintiff's Brief Supporting Preliminary Injunction.

**15.** Plaintiff's hearing exhibits 1–8 include the Soil Survey results and accompanying maps submitted to the Corps on August 13, 1982.

new EIS supplement.[16] The Corps is continuing to study the concerns expressed in the final OFWD study and to date has determined that no significant new information has been discovered justifying a new EISS.[17]

The study conducted by the U.S. Soil Conservation Service and submitted to the Corps in 1982 was discussed at length during the preliminary injunction hearing. The Corps' erosion control and sediment specialist who received this survey testified he did not consider it in a reevaluation of the environmental consequences of the dam. He testified that, while the soil mapping information is helpful in looking at the management of the project, as a scientific document evaluating turbidity production it is not very helpful.[18] He concluded that this survey did not produce significant new information justifying a new EIS supplement.

The Corps has concluded that no significant new information has been discovered which requires supplementation of its FEISS. Based on the information contained in the two studies at issue, and the Corps' review of them, I agree that the Corps' conclusion not to supplement its FEISS was reasonable.

### III. CONCLUSION (NEPA):

■ None of the ONRC's alleged NEPA violations in the Corps' FEISS is substantiated. The Corps took a hard look at the environmental consequences of the project and Congress had the full benefit of that hard look when it directed that the Corps proceed with construction.

Congress' substantive decision is not subject to judicial review. As the 5th Circuit concluded in *Sand,*

> Congress was very aware of the environmental problems which surrounded the project but chose to approve it (over the

---

**16.** *See* December 13, 1985 Affidavit of Jeffrey C. Laufle, Corps fishery biologists responsible for managing the ODFW Rogue River Fishery Evaluation Studies. *See also* reference to December 9, 1985 deposition of Steven Cramer cited to in Defendant's Memorandum in Support of Summary Judgment and in Opposition to Plaintiff's Application for Injunctive Relief, pgs. 39–41.

**17.** The final Phase I completion report has been under review since it was submitted to the Corps in August, 1985. The evaluation has been conducted by Jeffrey Laufle, Corps fishery biologist and outside experts. *See* Jeffry Laugle Affidavit, supra n. 36.

In November, 1985 at the request of the Corps' Portland District Office, the Corps' Waterways Experiment Station performed temperature modelling for the Rogue River with the proposed Elk Creek Dam in place. This study concluded that "Elk Creek Dam will have a minor influence on temperature in the Rogue River. This is due to the small portion of Rogue River flow contributed by Elk Creek. In most cases, the results indicate that Rogue River temperatures with Elk Creek Dam should be about the same or slightly cooler. The only periods that showed a discernable increase in Rogue River temperatures with Elk Creek Dam were parts of July and August, 1979." Affidavit of Mark S. Dortch, December 12, 1985. This indicates that the Corps is continuing its obligation to evaluate the environmental consequences and to determine whether new information, such as that submitted by USFW, justifies supplementation of its FEISS.

**18.** Plaintiff's Hearing Exhibits 1–8. The survey documents and illustrates the composition of soils near the Elk Creek shoreline. It does not specifically identify soils with high turbidity potential, nor was it designed to evaluate turbidity potential.

Roger Borine, Area Soil Scientist for the USGS testified that with the use of a hydrometer it is possible to determine the content of particles in water to evaluate the density of water, i.e. the suspended solids in water. He testified that this measurement is the functional equivalent of turbidity. Based on his soil studies he concluded that 83% of the shoreline would have high sediment producing potential and, correspondingly, 83% would have high turbidity producing potential. These percentages are significantly higher than the FEISS indicates.

Borine acknowledged, however, that he is not an expert in measuring turbidity nor has he conducted tests on soils to determine turbidity potential. He further testified that he had no knowledge of what kind of soil testing the Corps had undertaken.

When asked the probable turbidity effect if the Corps began construction and soils are disturbed, Borine stated that the answer depends on whether there is proper management and proper cover of the area. This conclusion is consistent with the Corps' erosion control and sediment specialist's conclusion that the mapping survey is a helpful tool in managing the project but is not a scientific document regarding the turbidity potential.

President's contrary recommendation) in spite of these problems. Congress became the ultimate decision-maker. Such a legislative decision effectively supplants the Corps' decision to build the project and precludes our review of that substantive decision.

*Sand,* 629 F.2d at 1013, *citing Environmental Defense Fund, Inc., v. Corps of Engineers,* 492 F.2d 1123 (5th Cir.1974).

ONRC has not established its entitlement to a preliminary injunction. It fails both tests set out in *City of Tenakee Springs;* it has not established a likelihood, or even a serious question, that the Corps violated NEPA requirements in preparing its FEISS. Therefore, ONRC's motion for preliminary injunction is denied.

## IV. CONSOLIDATION OF HEARING AND TRIAL ON MERITS

This opinion, thus far, is of course one in which the test being applied is that of an application for a preliminary injunction. I recognize that the test is different when the issue is presented to the court on the merits. During the latter stages of the drafting of this opinion, ONRC filed a motion to consolidate the preliminary injunction hearing with the trial on the merits on the NEPA claim.

FRCP 65(a) gives me the discretion to treat a hearing for preliminary injunction as a final adjudication on the merits so long as the procedure does not result in prejudice to either ONRC or the Corps of Engineers. *Glacier Park Foundation v. Watt,* 663 F.2d 882, 886 (9th Cir.1981). Because the merits of the NEPA claim were reached at the preliminary injunction hearing, I exercise my discretion and grant ONRC's motion to consolidate the hearing and the trial.

For the reasons set forth above, I also deny on the merits plaintiffs' request for a permanent injunction on the NEPA claim. Thus, it becomes unnecessary for me to rule on the Corps' motion for summary judgment. If I were to address the Corps' motion, however, I would undoubtedly

grant that motion for the reasons explained above.

Because I find that there is no just reason for delay, I expressly direct the clerk to enter a final judgment against ONRC on the NEPA claim, pursuant to FRCP 54(b). I further direct the clerk to enter an order dismissing ONRC's WASRA claim, without prejudice, pursuant to FRCP 41(a)(2).

IT IS SO ORDERED.