In the Matter of the Application of
SDDS, INCORPORATED, for
a Solid Waste Permit.

No. 17180.

Supreme Court of South Dakota.

Argued March 18, 1991.
Decided June 26, 1991.

Patrick Duffy of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for appellant Technical Information Project; Mark F. Marshall of Bangs, McCullen, Butler, Foye & Simmons Rapid City, on brief.

Marvin D. Truhe of Marvin D. Truhe Law Offices, Rapid City, for appellee South Dakota Disposal Systems, Inc.; Dale R. Cockrell and Marvin D. Truhe of Marvin D. Truhe Law Offices, Rapid City, on brief.

Brian L. Radke, Asst. Atty. Gen., Pierre, for amicus curiae S.D. Dept. of Water and Natural Resources; Roger A. Tellinghuisen, Atty. Gen., Pierre, on brief.

AMUNDSON, Justice.

Technical Information Project (TIP) appeals from a judgment of the circuit court affirming the decision of the Board of Minerals and Environment (Board) to grant a permit to South Dakota Disposal Systems, Inc. (SDDS) for the construction and operation of a municipal solid waste balefill disposal facility. We affirm in part, reverse in part, and remand.

**1.** Events occurring subsequent to the issuance of the original permit, including the following, are not at issue in this appeal: (1) the passage at the November 6, 1990, general election of Initiated Measure # 1; (2) Board's renewal of the original permit on December 5, 1990; (3) passage by the 1991 Legislature of Senate Bill 169 approving the siting, construction, and operation of Lonetree, and finding that the facility is environmentally safe and in the public interest; and (4) Referendum No. 1 currently pending for the 1992 general election to refer to the voters of the state Senate Bill 169.

**2.** The original application was formally supplemented in January 1989 and June 1989.

## FACTS

This controversy involves the validity of Board's original decision to issue a solid waste permit to SDDS.[1] On November 17, 1988, SDDS filed an application with the South Dakota Department of Water and Natural Resources (Department) for a solid waste permit.[2] SDDS sought a permit to construct and operate the Lonetree Balefill Facility (Lonetree) in Fall River County near Edgemont, South Dakota. The municipal solid waste (MSW) disposal facility was designed to receive approximately 7.75 million tons of baled MSW.

Department reviewed the permit application and found it procedurally complete and otherwise in compliance with applicable laws and regulations. On June 30, 1989, Department published a recommendation of approval in the *Rapid City Journal*, however, the recommendation was in error and Department immediately withdrew the recommendation of approval. On July 10, 1989, pursuant to an Alternative Writ of Mandamus, Department published a recommendation of denial in four local newspapers, the *Rapid City Journal*, the *Sioux Falls Argus Leader*, the *Edgemont Herald–Tribune*, and the *Pierre Times*. The recommendation listed six deficiencies of the permit application,[3] and included a notice that aggrieved persons could petition the Board for a contested case hearing within thirty days.

**3.** The text of the notice follows:

NOTICE OF APPLICATION,
THE RECOMMENDATION
AND TENTATIVE DECISION
By the South Dakota Department of
Water and Natural Resources

The South Dakota Department of Water and Natural Resources has received an application and, having reviewed the plans and specifications and inspected the site, has reached a tentative decision and recommended to the Board of Minerals and Environment that a Solid Waste permit be denied for the SDDS, Inc. Lonetree Balefill Facility located approximately five (5) miles south of Edgemont, South Dakota.

SDDS petitioned for a contested case hearing, opposing Department's recommendation. Department published its Notice of Contested Case Hearing setting the hearing on SDDS' permit application for August 23, 1989, and notifying interested persons of the opportunity to intervene. TIP then filed its Petition to Intervene/Request for Environmental Impact Statement on July 19, 1989. TIP's requests were considered at a prehearing conference held on July 20, 1989. The hearing chairperson granted TIP's petition to intervene [4] but denied its request for an environmental impact statement (EIS). Thereafter, the parties engaged in discovery.

Prior to the hearing, SDDS continued to correspond with Department in an attempt to satisfy Department's requirements and cure the deficiencies prior to the hearing on the permit application. All of the correspondence between SDDS and Department,

and all of the additional information submitted by SDDS to Department, was immediately made part of the public permit application file.

SDDS' attempts to cure all the deficiencies in the hope that Department might change its recommendation from one of denial to one of approval were unsuccessful. At the time of the hearing, SDDS disputed the design mandated by Department for the final clay cap to be placed on the facility. As a result, although five of the six deficiencies were cured by the hearing date, Department recommended denial of the permit at the hearing based on the cap design deficiency.

The contested case hearing was held before Board on August 23–26, 1989, and September 7, 1989. Eighteen witnesses, most of them experts, testified at the hearing.[5] Department continued to recommend

This recommendation is based upon, but not limited to the following factors related to the requirements of SDCL 34A–6–1.1 through 34A–6–1.38, inclusive.

1. The Department has not been provided with a list of the states or sources which may initiate the transportation of solid waste so that the Department can ascertain the type of quality control exercised by those entities regarding their respective baling installations.

2. The Department has not been provided with a draft Operations Manual for the State's review and comment. The Department requires an approved Operations Manual prior to shipment of baled municipal solid waste for disposal at the proposed facility.

3. The Department has not been provided with adequate financial assurances including monetary provisions for the remediation of environmental damages resulting from design or operational problems. The Department requires that a fund be established for catastrophic occurrences with severe environmental implications prior to any facility operations.

4. The Department has not been provided with adequate plans and specifications in regard to the design of the liner system, the capping system and the groundwater monitoring system.

5. The Department has not been provided with a financial plan detailing the costs of the solid waste facility and the funding sources for the project.

6. The Department has not been provided with an adequate emergency response and remedial plan.

This tentative decision shall be considered the Department's recommendation to the Board of Minerals and Environment. In accordance with SDCL 34A–6–1.14, thirty days after publication of this notice, the Department's tentative decision will become the Board's final decision and this application will be denied unless a person adversely affected or having an interest adversely affected by the Department's tentative decision petitions the Board for a contested case hearing. The petition must comply with the requirements of ARSD 74:09:01:01. If petitions for such a hearing are not filed by August 9, 1989, the applications will be formally and finally denied at that time.

Date: July 6, 1989
By: John J. Smith, Secretary
Department of Water and
Natural Resources
287    July 10, 1989

4. In addition to TIP, one hundred twenty-three other individuals and organizations subsequently intervened in the proceedings before Board. However, only TIP has appealed Board's decision.

5. Testifying for SDDS were the following individuals:

(1) John Brumley, one of six members of the Fort Worth, Texas, investment group which holds a 40% interest in SDDS (testified regarding the character of SDDS president Hunter Swanson, and the financial status and commitment of the investment group);

(2) Thomas K. Tulk, director of SDDS (led board members on tour of proposed site);

(3) Hunter S. Swanson, president of SDDS (presented slide presentation on proposed Lonetree facility);

denial of the permit but, in the alternative, recommended that conditions be attached to any permit issued by Board. On September 7, 1989, after the conclusion of the hearing, Board approved SDDS' permit application by a vote of five to one. Findings of fact and conclusions of law were entered by Board on the same day. A one-year permit to construct and operate Lonetree, together with ten pages of conditions, was issued to SDDS on September 21, 1989.

TIP appealed Board's decision to the Seventh Judicial Circuit Court, which affirmed Board's decision in its entirety. From that decision, TIP appeals.

(4) Kevin Tveidt, of Special Resources Management, Inc. of Pierre, South Dakota (testified regarding his company's training of personnel to detect, handle, and dispose of potential hazardous waste, treatment of contaminated soil and groundwater, and a 24-hour emergency response plan);

(5) James Rouse, director of geohydrology for Geochemical Engineering, Inc. (testified regarding site analysis in the areas of geohydrology, geochemistry, water quality, and monitor wells);

(6) R. Rick Baker, vice president and professional engineer for FMG, Inc. (presented testimony regarding the development of geologic data, drilling for core samples and wells, design, preparation of plans and specifications for construction of the facility, including specifically clay liners, synthetic liners, water collection and drainage, closure, cap design and erosion);

(7) Larry Brown, Ph.D., consultant in plant ecophysiology and range ecology (testified on closure, post-closure, and reclamation involving costs of monitoring and maintaining the site upon closure, vegetation, soils, erosion and compaction of the final cover);

(8) Keith Anderson, assistant general manager of Silver King Mines decommissioning project and prospective manager of Lonetree (testified about his experience in disposal of contaminated soils and wastes, monitoring, record keeping, Nuclear Regulatory Commission requirements for clay liners, and availability of engineering and construction personnel skilled in use of heavy equipment and environmental monitoring in the Edgemont, South Dakota area);

(9) James Emery, state senator (testified on the public interest and support for Lonetree);

(10) Jerry Chesley, president of Edgemont Chamber of Commerce and physician's assistant at local medical clinic (testified regarding public interest);

(11) Grant Trotter, mayor of Edgemont and owner of local hardware store (testified regarding public interest); and

## ISSUES

1. Did Board err in denying TIP's request for an environmental impact statement?
2. Was Board's decision based on unlawful procedure involving *ex parte* communications in violation of the due process rights of the people of South Dakota and TIP?
3. Did Board err in determining that the proposed facility is in the public interest of the entire state?
4. Did Board err in determining that the proposed facility is environmentally safe?

(12) David Daniel, associate professor of civil engineering at the University of Texas (testified on his experience in testing soil permeability and unsaturated soils, municipal solid waste landfills, and hazardous waste landfills; training state, federal and private groups in landfill design, soil liners, and cap systems; and research in land disposal of waste, and development of the sealed double ring infiltrometer (SDRI); evaluated site selection, preferred method of construction, cover, cap, liner, and testing for Lonetree proposal).

Testifying for TIP were the following individuals:

(1) Derric Iles, hydrologist, Division of Geological Survey, South Dakota Department of Water and Natural Resources (DWNR) (testified on his evaluation of SDDS' hydrological report and flaws in assessment of water table);

(2) John Foster Sawyer, graduate student in geology and employee of Division of Oil and Gas, State of South Dakota (testified about his geological mapping of the site and faults; paleontological significance of area; observations of pronghorn antelope, golden eagle, and swift fox at site; and observation of no black footed ferret, or ferruginous hawks at site); and

(3) Howard Henderson, Provo, South Dakota rancher (testified about the local weather conditions and water level of Coal Creek during his lifetime).

Testifying for DWNR and State were:

(1) Clark Haberman, director of Division of Air Quality and Solid Waste, South Dakota DWNR (testified regarding the cap requirement);

(2) Terry L. Jorgenson, Natural Resources Engineer, Division of Water Rights, South Dakota DWNR (testified about his technical review of the permit application, the cap/final cover, and possible conditions to be imposed should the permit be approved); and

(3) Terrence G. Keller, Natural Resources Engineer and head of permit section, Division of Air Quality and Solid Waste, South Dakota DWNR (testified on DWNR cap requirements for a project facility near Igloo, South Dakota).

ANALYSIS

Our standard of review in administrative appeals is governed by SDCL 1–26–36, and is well settled. When reviewing questions of fact, it is the duty of both the circuit court and this court to determine whether the agency's findings of fact are clearly erroneous. *Kennedy v. Hubbard Milling Co.*, 465 N.W.2d 792, 794 (S.D.1991); *Permann v. Department of Labor, Unemployment Ins. Div.*, 411 N.W.2d 113, 116–17 (S.D.1987). Further, "the question is not whether there is substantial evidence contrary to the agency finding, but whether there is substantial evidence to support the agency finding.... [T]he court shall give great weight to findings made and inferences drawn by an agency on questions of fact." *Schlenker v. Boyd's Drug Mart*, 458 N.W.2d 368, 371 (S.D.1990) (*citing Lawler v. Windmill Restaurant*, 435 N.W.2d 708, 711 (S.D.1989) (Morgan, J., concurring specially)). When the issue presented is a question of law, however, the decisions of the administrative agency and the circuit court are fully reviewable. *Permann*, 411 N.W.2d at 117. Likewise, mixed questions of fact and law, which require the application of a legal standard to an established set of facts, are fully reviewable. *In re Groseth Int'l*, 442 N.W.2d 229, 232 (S.D.1989) (Sabers, J., concurring in part and concurring specially in part). With these standards in mind, we address the merits of the issues raised by TIP.

*1. Request for Environmental Impact Statement.*

TIP contends that the hearing chairperson erred when he denied its request for an EIS. SDDS responds by arguing that TIP failed to satisfy statutory prerequisites which must be met before an EIS may be ordered, and that the decision to order an EIS is a discretionary one.

SDCL chapter 34A–9 provides the statutory mechanism for addressing the environmental impact of governmental actions. SDCL 34A–9–4 provides in part: "All agencies *may* prepare, or have prepared by contract, an environmental impact statement on any major action they propose or approve which may have a significant effect on the environment." (Emphasis added.) Under this section, an EIS is optional, not mandatory. *In re Water Management Board*, 351 N.W.2d 119, 124 (S.D.1984). TIP has conceded that the decision to require an EIS is discretionary. Since the matter is one which lies in the discretion of the agency, we can reverse its decision only if it reflects a clearly unwarranted exercise of discretion. SDCL 1–26–36(6). *See Estate of Donahue*, 464 N.W.2d 393 (S.D.1990) (defining abuse of discretion standard). *Cf. Lee v. Department of Health*, 411 N.W.2d 108 (S.D.1987); *In re Templeton*, 403 N.W.2d 398 (S.D.1987).

TIP filed its Petition to Intervene/Request for Environmental Impact Statement one day before the first prehearing conference. TIP's request that SDDS be required to complete an EIS was supported by two sentences in its motion:

The Technical Information Project further moves that the Board require SDDS to complete an [EIS] pursuant to SDCL 34A–9. Many of the requirements of SDCL 34A–9 and ARSD 74:27:01 through 04 can only be assessed for compliance if a comprehensive environmental study is undertaken.

At the prehearing conference, TIP did not present evidence to support its motion. TIP's counsel argued that SDDS' permit application was a major action and that the facility would have a significant effect on the environment, but did not allege any specific facts to support its request for an EIS. Department argued that an EIS was unnecessary because the concerns that could be addressed by an EIS were adequately addressed by the review conducted by the state archaeologist, and a previously published study of rare plants and animals in South Dakota conducted by the state Game, Fish, and Parks Department and The Nature Conservancy. SDDS argued that an EIS would be duplicative of information already contained in the administrative file, that preparation of an EIS would delay the project for two years, and that there was no showing that the project will have a significant effect on the environment.

"The purpose of an environmental impact statement is to provide detailed information about the effect which a proposed action is likely to have on the environment, to list ways in which any adverse effects of the action might be minimized, and to suggest alternatives to the action." SDCL 34A–9–4. At the time of the prehearing conference on July 20, 1989, SDDS' permit application had been evaluated for technical and engineering compliance by a number of state agencies, including Air Quality and Solid Waste, Water Rights, the Ground Water Quality Program, the Surface Water Program, Geological Survey, the Oil and Gas Program, Division of Wildlife, and the Archaeological Research Center. The Lonetree proposal was also reviewed by the United States Environmental Protection Agency. Each of these agencies made recommendations and comments based on SDDS' permit application and supplements thereto. In addition to the data contained in the permit application and supplements, SDDS submitted a geological site characterization, leachate and surface drainage analysis, project plans and specifications for operation, closure, and post-closure, and a geohydrologic evaluation. All this information, including agency comments and recommendations, was in the administrative record available to the hearing chairperson at the time of the prehearing conference.

With this information before him, we cannot say that the hearing chairperson abused his discretion in denying the request for an EIS. TIP did not demonstrate that the available information was insufficient for Board to evaluate the potential impact of Lonetree, nor did it attempt to do so. Where, as here, the administrative record contained information regarding the environmental impact of the proposed facility, we cannot say that the refusal to require an EIS was against reason and the evidence. *See Estate of Donahue*, 464 N.W.2d 393.

TIP further argues that the decision on the EIS must be remanded because the hearing chairperson failed to make findings of fact and conclusions of law when denying the motion. TIP argues that remand is necessary because there is no rationale for a reviewing court to consider. At the first prehearing conference, the hearing chairperson considered the request and stated on the record that the motion was denied. A prehearing order was issued, however, it did not address the denial of TIP's request for an EIS, and no findings and conclusions were entered on any of the matters considered at that first prehearing conference.

TIP did not renew its motion for an EIS after completing discovery or at the contested case hearing before Board, although it continued to challenge the environmental safety of the project at the hearing. TIP did not, however, request that Board overrule the hearing chairperson's earlier decision that the EIS request be denied.[6] Board's findings of fact, conclusions of law and order did not address the prior requests for an EIS. However, Board did find that both the site and the proposed facility were "environmentally safe," and that "operation of the facility as proposed will not cause the air, water, or lands of the state to be polluted."[7]

SDCL 1–26–25 requires that an agency make findings of fact and conclusions of law when rendering a "final decision or order" in a contested case. *Department of Public Safety v. Eastman*, 273 N.W.2d 159, 160 (S.D.1978). The administrative rules relating to contested case hearings before Board provide that the hearing chairperson will decide all prehearing motions and make a decision on all such motions at the prehearing conference. ARSD 74:09:01:09; ARSD 74:09:01:10. *Cf.* ARSD 74:09:01:08 ("Any decision made by the hearing chairman is a final decision of the board unless reversed by a majority of the board at the hearing on the matter.") The hearing chairperson's decision is subject to

---

6. On August 8, 1989, Donald Pay, one of the intervenors in the contested case hearing before Board, requested that an EIS be prepared. Pay participated in the second pretrial conference held on August 14, 1989. He did not raise the matter of his request for an EIS at that time, and the hearing examiner did not rule on his request.

7. The adequacy of these findings is discussed in issues 3. and 4., *infra*.

reversal by the full board at the contested case hearing. ARSD 74:09:01:08. The rules also state that any matter that may properly be discussed at a pretrial conference under the rules of civil procedure may be heard at the prehearing conference. ARSD 74:09:01:10.

TIP's prehearing motion for an EIS is similar to a pretrial motion in a civil case. The necessity of making findings and conclusions when deciding civil motions is addressed in SDCL 15–6–52(a). It states in part: "Findings of fact and conclusions of law are unnecessary on decisions of motions under § 15–6–12 or § 15–6–56 *or any other motion* except as provided in § 15–6–41(b)." SDCL 15–6–52(a) (emphasis added). Findings of fact and conclusions of law are typically not required when deciding civil pretrial motions and TIP has failed to cite any authority indicating a contrary rule when an agency decides prehearing motions.[8] Accordingly, the hearing chairperson was not required to enter findings and conclusions when ruling on the motion for an EIS.[9]

■ SDDS has argued that the hearing chairperson could not even consider the option of ordering an EIS until TIP first established that approval of the proposed facility constituted a "major action" and that the facility would have a "significant effect on the environment." *See* SDCL 34A–9–4. Indeed, the statute evidences the legislature's intent that an EIS not be required in each action that an agency takes. *Water Management Bd.*, 351 N.W.2d at 124. In *Water Management Board*, however, we did not address whether SDCL 34A–9–4 imposed prerequisites before an agency may consider a motion to prepare an EIS. *Id.* The plain words of SDCL 34A–9–4 require that there be a "major action," and that the major action "may have a significant effect on the environment."

Such prerequisites act to reduce the number of situations in which an EIS might be prepared, and are consistent with the intent that an EIS not be required in every action. *See Water Management Bd.*, 351 N.W.2d at 124.

With that established, SDDS contends that TIP failed to present evidence to satisfy these prerequisites and, as a result, the hearing chairperson could not consider ordering preparation of an EIS. TIP responds that the facts necessary to determine whether approval would constitute a "major action" or have a "significant effect on the environment" are contained in the administrative file which was before the hearing chairperson and a matter of public record. Under this particular set of circumstances, we agree.

The mere fact that SDDS' permit application proposed to import garbage from other states into South Dakota, and to dispose of it in a relatively unique facility was sufficient to establish that the approval would constitute a major action. The sheer volume of the administrative file, and Department's constant activity regarding the SDDS application, makes it apparent that approval would constitute a major action. Given the considerable public attention and controversy over Lonetree, SDDS' suggestion that it was not a major action is incredulous, if not frivolous.

The second prerequisite, that the proposed action "may have a significant effect on the environment," needs clarification. SDDS' suggestion that this required TIP prove that Lonetree *will have* an adverse effect is incorrect. What must be established is that the action *may have* a potentially significant effect on the environment; Board may require or prepare an EIS if there is a *possibility* that the major action they propose or approve will pose a threat to the environment. An EIS is designed to detail the possible impact of the proposed

---

8. TIP has asserted that motions involving the resolution of conflicting facts require that findings of fact and conclusions of law be entered. *See Heikkila v. Carver,* 416 N.W.2d 591, 592 (S.D.1987); *Voth v. Voth,* 305 N.W.2d 656 (N.D.1981). As noted previously, however, the decision on whether to prepare an EIS is a discretionary one; it does not require the reso-

lution of conflicting facts. Thus, TIP's argument and authority are inapposite.

9. Had TIP renewed its motion for an EIS at the contested case hearing before Board, we would be presented with a different question. Because they did not do so, however, we do not express an opinion on that hypothetical situation.

action. The statute does not require that a significant adverse effect on the environment be definitively proven, for that is the purpose of an EIS. Here, Department itself questioned the safety of Lonetree, and its concerns were detailed in the record before the hearing chairperson. Thus, the statutory prerequisites had been satisfied, and TIP's motion for an EIS was properly before the hearing chairperson for consideration. However, as we have held, the decision of whether to order the preparation of an EIS is discretionary and based on the administrative record at the time of the prehearing conference, we find no abuse of discretion in denying TIP's request for an EIS.

### 2. Change of Recommendation Based on Ex Parte Contact.

■ Next, TIP contends that SDDS surreptitiously obtained Board's approval of the permit application. This argument is propounded even though all allegedly *ex parte* contacts between the parties (SDDS and Department) were filed in the public record maintained by Board on the permit application, and which was available to TIP for its review at any time. TIP argues that SDDS had *ex parte* contact with Department, and that this contact resulted in a *de facto* change in Department's recommendation from one of denial to one of approval. According to TIP, the cumulative effect of this procedure resulted in a violation of the due process rights of every South Dakotan.

TIP bases its contention that *ex parte* contacts and negotiations took place on the following facts. Department published its recommendation that SDDS' permit application be denied and the six deficiencies which formed the basis for that denial. In the six weeks between the time that the denial and deficiencies were published and the date of the contested case hearing, SDDS contacted Department in a continuation of its ongoing efforts to secure a recommendation of approval by satisfying or "curing" the noted deficiencies. Department and SDDS corresponded constantly over the design specifications and modifications necessary to satisfy Department standards. SDDS also provided Department with financial plans and assurances, a list of possible source states of MSW, an operations manual, and an emergency response plan.

By the date of the contested case hearing, SDDS had cured five of the six deficiencies outlined in Department's recommendation of denial. The remaining deficiency was the failure of SDDS to comply with Department's design specifications for the cap to be placed on the facility. At the contested case hearing, Department recommended denial of SDDS' permit application based on the outstanding cap deficiency. Department also presented to Board an alternative list of conditions to be satisfied in the event that the permit was granted. TIP presented testimony at the hearing contesting the adequacy of SDDS' financial assurances, design of the facility to deal with catastrophic storm events, possible contamination and monitoring of ground water, and the design of the cap.

TIP argues that the ongoing efforts between SDDS and Department to satisfy the deficiencies were negotiations conducted without knowledge of the public and without notice of Department's new position. It is these alleged negotiations that TIP asserts constitute improper *ex parte* communications. According to TIP, failure to notify the public of the *de facto* change to a recommendation of approval with conditions is a violation of due process.[10] Board rejected TIP's claim and concluded that there was no due process violation. Following its review, the circuit court found that the correspondence and contacts between SDDS and Department were not improper and that Department did not change its ultimate recommendation to deny the permit. We agree. The question of whether there were *ex parte* contacts is a factual one, which we will reverse only if clearly erroneous. *Permann,* 411 N.W.2d

---

**10.** TIP does not contend that it had no notice of the alleged *de facto* change in the recommendation, but states in its brief that it "became aware of the Department's position only 36 hours before [the] hearing."

at 116–17. At the first prehearing conference when TIP was granted leave to intervene, TIP was fully apprised of the nature of the permitting process and the contacts between SDDS and Department.

SDCL 1–26–26 prohibits *ex parte* contacts between members of an agency who hear a contested case and a party in the contested case. The correspondence and other contacts between SDDS and Department do not constitute *ex parte* communications because Department is not the decisionmaker. When a contested case hearing is held on a solid waste permit application, it is Board that acts as the adjudicatory body, not Department. SDCL 34A–6–1.13; SDCL 34A–6–1.35. *See* ARSD ch. 74:09:01; SDCL 1–32–1. It is Board that acts as the decisionmaker, not Department. TIP did not contend that SDDS had direct communications with Board and thus, Board's rejection of TIP's claim was proper.

Further, Department's role in contested case proceedings is as a party. *Cf.* ARSD 74:09:01:03. During the hearing Department acts as an advocate, opposing the applicant (or party requesting the contested case hearing) and advocating to Board that it accept Department's recommendation. Board is not obligated to adopt Department's recommendation. Even prior to the hearing, Department is charged with the initial duty of investigating the application. SDCL 34A–6–1.14. This investigatory role also underscores the fact that Department cannot participate in the decision-making. *See* SDCL 1–26–26.

TIP's argument that *ex parte* communications were improperly part of the proceedings arises out of confusion over the roles of Board and Department. If Department's recommendation on a solid waste permit application is not contested, the recommendation becomes the final decision on the application for the permit. SDCL 34A–6–1.14. When a petition is filed initiating contested case proceedings, Department then takes on the role of an advocate, and Board then assumes its quasi-judicial role

as decisionmaker. *See* SDCL 34A–6–1.35. However, communications between Board and Department are authorized and do not constitute unlawful *ex parte* contact. SDCL 1–26–26. Contact with Department is not the equivalent of contact with Board.

Also part of TIP's argument that *ex parte* communications were had is that, as a result, Department altered its recommendation of denial to one of approval with conditions. Board rejected TIP's contention that a *de facto* change of recommendation had taken place.[11] The circuit court's finding that no such *de facto* change occurred is supported by the fact that at the hearing Department continued to urge denial of SDDS' permit application.

TIP's reliance on the fact that Department noted only one outstanding deficiency, and offered an alternative set of conditions to be imposed on the permit if approved, is misplaced. Department's alternative recommendation that approval be given only if the permit were subject to conditions was just that, an alternative position in the event that Board did not adopt its recommendation of denial. Further, the outstanding deficiency regarding design of the cap for the facility was significant enough to cause Department to continue to recommend denial of the permit at the hearing, and was the subject of a substantial amount of testimony at the hearing. TIP now contends that this deficiency was more illusory than real, and that whether Department recommended denial based on this defect or approval with conditions is merely a matter of semantics. Throughout the hearing, TIP itself opposed SDDS' cap design, even offering expert testimony on this point. TIP obviously felt this was a significant issue at the contested hearing. A party may not claim a better version of the facts on appeal than claimed below, and TIP's contention is not supported by the record. *See Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 838 (S.D.1990). TIP has failed to show that Board erred in rejecting

---

**11.** Again, Board's findings did not specifically refer to this argument of TIP, but referred to all

remaining arguments as meritless.

its claim that Department changed its recommendation.

It is apparent that there is no basis for TIP's claim that a due process violation occurred. TIP and the other intervenors, as well as the people of South Dakota in general, were all notified of Department's recommendation well before the hearing, of the date of the contested case hearing, and of the right to participate in the hearing process. The contacts between SDDS and Department were made part of the public file and made with the full knowledge of TIP. The conclusion of Board and the circuit court that TIP and the members of the public at large were afforded complete due process rights is correct. *See Water Management Bd.*, 351 N.W.2d at 124.

### 3. Public Interest.

TIP contends that Board's finding that the issuance of the permit is in the public interest is insufficient to provide meaningful appellate review, and that the facts revealed at the hearing were insufficient to support that finding. Whether the permit is in the public interest requires the resolution of disputed facts and we can reverse the agency's finding only if clearly erroneous. *Permann*, 411 N.W.2d at 116–17. By statute, no solid waste permit may be issued in a contested case unless Board finds that to do so is in the public interest. SDCL 34A–6–1.13. Here, Board found that "[g]ranting the Permit is in the public interest." According to TIP, this ultimate finding is not detailed enough to enable a reviewing court to determine the grounds on which the decision was made.

In *Lemke v. Rabenberg's, Inc.*, 89 S.D. 386, 233 N.W.2d 336 (1975), we construed SDCL 1–26–25, which states in part:

Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings. If, in accordance with agency rules, a party submitted proposed findings of fact, the decision shall include a ruling upon each proposed finding.

As we noted in *Lemke*, this statute was adopted from § 12 of the Model State Administrative Procedure Act (1961) of the National Conference of Commissioners on Uniform State Laws. *Id.* at 339, 233 N.W.2d 336. Of particular significance is the Conference's note which we cited with approval:

An attempt is here made to require agency findings to go beyond a mere statement of a general conclusion in the statutory language (e.g., that 'public interest, convenience and necessity' will be served) or in language of similar generality. The intent is to require the degree of explicitness imposed by such decisions as *Saginaw Broadcasting Company v. Federal Communications Commission* (Ct.App.D.C., 1938), 96 F.2d 554, where the court required a statement of the 'basic or underlying facts.'

*Id.* The intent of SDCL 1–26–25 is to require adequate findings to aid in meaningful judicial review.

Here, Board's finding is merely a statement of the statutory requirement of SDCL 34A–6–1.13: "Granting the Permit is in the public interest." This is precisely the kind of finding the statute prohibits. As we noted in *Lemke*, the failure of the agency's findings to reveal the underlying facts effectively forecloses judicial review. 233 N.W.2d at 339. Therefore, the public interest issue must be remanded for findings consistent with this opinion.

SDDS urges that there is adequate evidence in the record to support a finding that issuance of the permit is in the public interest, and that "an administrative agency is allowed to incorporate by reference matters upon which it has heard evidence as the basis for a Finding of Fact, from which the reviewing court may thereafter discern the basis upon which the agency reached their decision." However, Board did not incorporate by reference anything (such as a memorandum decision) upon which we can discern the underlying basis for its public interest finding.[12]

---

**12.** Although the findings did incorporate the Permit Conditions by reference, the conditions do not address the public interest issue.

Our task, however, is not to review the hearing transcript and exhibits *de novo* to discern whether such an ultimate finding could be supported. This court is not to speculate or guess what portions of this voluminous record were relied on by Board in determining that granting the permit was in the public interest. This would require the ability to look into the minds of six Board members to determine what part of the evidence persuaded them. This is not a task this court attempts or elects to undertake. Our review is limited to whether the agency's findings are supported by adequate evidence. *See Schlenker*, 458 N.W.2d at 371. Without adequate findings of fact, we have no basis upon which to conduct our review, and we cannot reach the merits of TIP's argument that the evidence presented at the hearing was insufficient to support the public interest finding. We must remand on this issue for entry of appropriate findings, based on the record before Board at the hearing, in accordance with this decision.

### 4. Environmental Safety.

■ TIP also contends that Board's findings that the facility is environmentally safe do not satisfy the degree of explicitness required by SDCL 1-26-25, and *Lemke, supra*. On this issue, Board made the following findings:

7. The proposed site is suitable for the proposed facility and is environmentally safe.

8. The proposed facility is suitable, environmentally safe, and operation of the facility as proposed will not cause the air, water, or lands of the state to be polluted.

9. Applicant has provided all necessary information to the Department and to Board to comply with applicable statutes and regulations in order for Board to make a decision regarding the application.

Board also incorporated the Permit Conditions into its findings.

Solid waste disposal sites must meet the requirements of ARSD 74:27:03:08.[13] This rule specifically sets out five requirements that a disposal site location must satisfy, none of which were addressed in Board's findings. A proposed solid waste disposal facility and its operation, particularly one involving a new or unique method of disposal, must meet the standards of ARSD article 74:27, and in particular rules 74:27:02:01 (minimum requirements for collection, transportation, storage, and processing), 74:27:03:07 (new methods of solid waste disposal), 74:27:04:04 (permits for disposal facilities using new methods), and 74:27:04:09 (conditional permits for special solid waste disposal systems). Unlike the statutory mandate that Board find that a proposed facility be "in the public interest," there is no equivalent statutory provision or regulation that the site and the facility be found to be "environmentally safe" and "not cause the air, water, or lands of the state to be polluted." These

---

**13.** ARSD 74:27:03:08 provides:
Solid waste disposal operations must comply with the following criteria:
(1) The location shall not cause significant adverse affect to wildlife, recreation, aesthetic value of an area, or threatened or endangered species;
(2) The location shall not be within an area where solid waste or leachate is likely to contaminate any surface water. To prevent this, the facility shall not be within a minimum distance of 1,000 feet of a lake, pond, slough, river, stream, or other wetland unless the operator of the disposal site submits satisfactory evidence showing that pollution of such waters is not likely. Greater distances shall be required if the department determines this distance is not sufficient to provide adequate protection to these waters;

(3) The location shall not be within an area where leachate could potentially contaminate any groundwater. To prevent this, the minimum distance between any solid waste and the historically high groundwater table must be six feet. Greater distances shall be required if the department determines this distance is not sufficient to provide adequate protection to the groundwater;
(4) The location shall not be within a 100-year floodplain unless mitigating measures to be approved by the department are initiated;
(5) The location shall not be visible or within 1,000 feet of a public park, principal or minor arterial, major collector, or an area where the facility constitutes a potential safety hazard to the public unless mitigating measures are applied to ensure compliance with § 74:27:03:01.

are merely general statements of the many detailed provisions of SDCL ch. 34A–6 and ARSD article 74:27 which must be satisfied before a solid waste permit may be issued. In this regard, Board's findings again wholly fail to satisfy SDCL 1–26–25 as they did not state the underlying basis for Board's determination. Board's finding that SDDS provided all information necessary to make its decision does not alter this fact.

The Permit Conditions which were specifically incorporated into Board's findings by reference fail to do more than recite the technical specifications, and the operational and financial plans. They do not provide a basis on which we can determine how Board resolved the many disputes about environmental factors that were the subject of expert testimony by witnesses for each of the parties. We cannot resolve the conflicting testimony or determine whether the construction specifications adequately address the various environmental concerns raised at the hearing. There is no question that Board's findings are so general and conclusory as to wholly fail to satisfy the standards of SDCL 1–26–25 and *Lemke, supra*. Unfortunately, the Permit Conditions do not help us in determining Board's underlying basis for its conclusion that the site and facility are environmentally safe. Accordingly, this issue must also be remanded to Board for more particular findings, based on the record before Board at the hearing.

We also note that SDDS has argued that the adequacy of Board's findings, issues 3. and 4. herein, were not preserved for appeal, and that the evidence and testimony at the hearing *overwhelmingly supported* their position that issuance of the permit is in the local, state, and national public interest and environmentally safe. The circuit court determined that TIP did preserve this issue by filing its own proposed findings of fact and conclusions of law in accordance with *Moody County v. Cable,* 82 S.D. 537, 150 N.W.2d 193 (1967). As previously noted, however, the parties' proposed findings and conclusions were not included in the administrative record transmitted to this court. We are not unmindful of the appar-

ent failure of TIP to preserve the issues of the adequacy of Board's findings regarding the public interest and environmental safety. We admonish the litigants to note that it would be in their best interest for all parties to ensure that the settled record is complete when it is transmitted to this court. However, we are satisfied that these issues were adequately preserved, and given the significance of the issue of this proposed garbage dump, we have chosen to review these issues.

The decisions of Board and the circuit court are affirmed in part, reversed in part, and remanded for further findings consistent with this opinion.

MILLER, C.J., and WUEST, J., concur.

SABERS, J., concurs specially.

HENDERSON, J., concurs in part and dissents in part.

SABERS, Justice (concurring specially).

I commend the majority for its thorough discussion and analysis concerning the importance of an environmental impact statement as provided in SDCL chapter 34A–9. I write specially to point out that, in my view, an environmental impact statement clearly should have been prepared because the "Lonetree" proposal was a "major action" "which may have a significant effect on the environment." SDCL 34A–9–4. This was not a small, rural or local garbage dump that may present no need for an environmental impact statement.

HENDERSON, Justice (concurring in part; dissenting in part).

## I.

By a decision dated June 10, 1991, the United States Supreme Court refused to consider permitting states of the union to close their borders to out-of-state hazardous wastes. The United States Supreme Court rejected an appeal by Alabama officials seeking to ban hazardous wastes from certain states. *Natl. Solid Wastes, et al. v. Alabama Dept. of Envtl. Mgmt., et al,* 910 F.2d 713 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2800, 115

L.Ed.2d 973 (1991).

In 1989, Alabama enacted a law which prevented private companies in the State of Alabama from accepting hazardous waste from sites in states with no waste facilities. The United States Supreme Court upheld a ruling of the Eleventh Circuit Court of Appeals which had declared the Alabama law unconstitutional, the Eleventh Circuit ruling that it interfered with interstate commerce and it is pre-empted by environmental laws.

South Dakota's pertinent statute is SDCL 34A–6–1.1 which provides:

> The Legislature finds that other states have imposed stringent standards for the proper collection and disposal of solid waste and that without such standards and enforcement of them, South Dakota could be burdened with the importation and disposal in the state of large amounts of solid waste from other states by persons and firms who may not have the capability to properly dispose of the waste or who wish to avoid the costs and requirements for proper, effective and safe disposal of such waste in the state of origin.
>
> The Legislature finds that the disposal of large quantities of solid waste in this state will, in fact, impose additional burdens on the citizens of this state. Experience has shown that under the system of laws currently governing waste disposal in this country, this liability can be significant. For these and other reasons, the Legislature finds that it is reasonable and necessary to require that any person intending to dispose of waste in this state comply with the provisions of §§ 34A–6–1.2 to 34A–6–1.38, inclusive.
>
> The Legislature further finds that to ensure a minimum safe level of solid waste regulation nationally, the United States environmental protection agency is promulgating a comprehensive set of rules to govern the disposal of solid waste and that South Dakota must be prepared to comply with those rules.

These statutes speak to the importation of hazardous waste and, obviously, any judge in this state must interpret a legislative intent from these statutes walking a legal tight wire: keep within the law and yet preserve the beauty and safety of the land bequeathed to us by God. Also, in construing these environmental statutes concerning solid waste management and disposal, SDCL 34A–2–1 must be considered as to the adverse impact of a solid waste dump. The statute provides:

> Whereas the pollution of the waters of this state constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish and aquatic life, and impairs domestic, agricultural, industrial, recreational and other legitimate beneficial uses of water, and whereas the problem of water pollution in this state is closely related to the problem of water pollution in adjoining states, it is hereby declared to be the public policy of this state to conserve the waters of the state and to protect, maintain and improve the quality thereof for water supplies, for the propagation of wildlife, fish and aquatic life, and for domestic, agricultural, industrial, recreational and other legitimate uses; to provide that no waste be discharged into any waters of the state without first receiving the necessary treatment or other corrective action to protect the legitimate and beneficial uses of such waters; to provide for the prevention, abatement and control of new and existing water pollution; and to co-operate with other agencies of the state, agencies of other states and the federal government in carrying out these objectives.

Although I agree in the result of the opinion written by Justice Amundson, in reversing the approval of the permit, I believe that, additionally, this permit should not stand because the hearing officer, without explanation, denied the intervenors' timely request for an environmental impact statement. I fully appreciate that requiring such an impact statement is discretionary, rather than mandatory under South Dakota law. *In re Decision of Water Management Board,* 351 N.W.2d 119, 124 (S.D.1984). I rely on *Environmental Defense Fund, Inc. v. Froehlke,* 473 F.2d

346 (8th Cir.1972). In *Froehlke*, it was noted that at least four purposes are served by an environmental impact statement:

1. To ensure that agency officials will be acquainted with the trade-offs which will have to be made if any particular line of action is chosen;

2. To explicate fully the agency's course of inquiry, analysis, and reasoning, thus opening up the agency's decision-making process to critical evaluation by those outside the agency, including the public;

3. To supply a convenient record for courts to use in reviewing agency decisions on the merits; and

4. To provide full disclosure to the public of environmental issues.

*Minnesota Pub. Interest Research Group v. Butz*, 541 F.2d 1292 (8th Cir.1976), *cert. denied*, 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977).

I am particularly impressed with a part of the testimony of Clark G. Haberman, Director of the Air Quality and Solid Waste Division of the Department of Water and Natural Resources, who expressed that the application for the permit had not proceeded in the normal course of events.

In my opinion, there was an abuse of discretion to not require an environmental impact study. This facility, as designed, would take in approximately 1 million tons of garbage a year. This includes 1,200,000 pounds of hazardous waste including toluene, benzine and ammonia in the first year of operation, irrespective of any screening process which the applicant may employ. I am not a scientist but the permit would, uniquely, employ a "liner" which is to encase, apparently, millions of tons of garbage. An objective viewpoint by an impact investigation and statement, would address concerns for the environment and, particularly, an analysis of a "worst-case" scenario. *Save our Ecosystems v. Clark*, 747 F.2d 1240 (9th Cir.1984); *Oregon Natural Resources Council v. Marsh*, 628 F.Supp. 1557 (D.C. Or.1986).

TIP requested this impact statement approximately five weeks before the sched-uled hearing. It is to be noted that this motion was made at the first hearing in the contested case; considering the disastrous consequences that could conceivably occur under a "worst-case" scenario, an environmental impact statement should have been ordered. Therefore, I dissent on Issue I.

## II.

I concur on Issues II, III and IV. In so doing, I deign to express that entering findings of fact and conclusions of law consistent with the majority opinion, in the future proceedings below, are to be anything but mechanical. In other words, I do not perceive the entering of findings of fact and conclusions of law to simply have been, at the trial court level, technically incorrect. Rather, a finding that (1) the facility would be environmentally safe and a finding that (2) the facility would be in the public interest, must be based on a deep, piercing, reflective analysis which is based upon all of the testimony and, in my opinion, an environmental impact study. Potentially, a project involving nearly 8 million tons of solid waste poses serious threats to the environment of the State of South Dakota. I would opt that the Board take further evidence to determine if this facility is environmentally safe and if its construction and operation is in the public interest of all of the citizens of our state. *See,* SDCL 34A–6–1.3.

A further objective assessment of the risks presented by this project is needed. New findings of fact and conclusions of law should be entered. "Public interest is not susceptible of precise definition." *In re Application of Bermensolo*, 82 Idaho 254, 352 P.2d 240, 242 (1960). It "does not mean anything so narrow as the interests of the particular locality, which may be affected by the matters in question." *State ex rel. Glenn v. Crocket*, 86 Okl. 124, 206 P. 816, 817 (1922).

I am extremely concerned that the principals of SDDS have never owned, operated, or managed a solid waste garbage dump. According to the testimony below, this company has a current negative net worth and it is anticipated that the company will

generate approximately a 19 million dollar loss over its first three years of operation. This dump will generate leachate during its active operation. SDDS proposes a "geo-textile liner" to hold the toxic waste. Will the liner system work? This must be determined below. These are further considerations that should be legitimately considered in approving any permit to SDDS in the future.