BLACK HILLS NOVELTY COMPANY, INC., Plaintiff and Appellee,

v.

SOUTH DAKOTA COMMISSION ON GAMING, Defendant and Appellant,

and

Sodak Gaming Supplies, Inc., and IGT, Inc., Defendants and Appellants.

Nos. 18245, 18257.

Supreme Court of South Dakota.

Argued Nov. 29, 1993.

Reassigned April 29, 1994.

Decided Aug. 3, 1994.

Rehearing Denied Sept. 12, 1994.

Thomas H. Harmon of Tieszen Law Office, Pierre, for plaintiff and appellee.

Michael F. Shaw of May, Adam, Gerdes & Thompson, Pierre, for defendant and appellant South Dakota Com'n on Gaming.

Mark F. Marshall of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for defendants and appellants Sodak Gaming Supplies, Inc. and IGT, Inc.

MILLER, Chief Justice (on reassignment).

This is an appeal from a declaratory judgment action in which a trial court determined the enactment of ARSD 20:18:17:24.14 was an unconstitutional exercise of authority by the South Dakota Commission on Gaming. We reverse and remand.

## FACTS

"Quartermania" is the trade name for a group of progressive slot machines in Deadwood, South Dakota. "Progressive" means the jackpot increases each time a machine on the Quartermania system is played. The Quartermania machines at different casinos are electronically connected to a "progressive controller" which continuously monitors each connected machine for inserted coins and multiplies the coins by the rate of progression in order to determine the progressive jackpot. Machines linked together must each have the same probability of hitting the jackpot. The more machines linked together, the bigger the jackpot potential.

Each machine must also be connected to a meter which constantly updates and displays the jackpot amount to the player. Due to the meters and progressive controllers, progressive machines have additional security requirements inapplicable to other slot machines.

Quartermania is authorized under ARSD 20:18:17:24.14, a rule promulgated by the South Dakota Commission on Gaming (Gaming Commission). This rule allows a licensed manufacturer or distributor to supply the central computer which monitors each progressive slot machine in the system and displays the progressive amount, as well as providing other accounting data. The rule also permits a manufacturer or distributor to manage and monitor the accounting, collection and disbursement of progressive payouts.

IGT, Inc. is a licensed manufacturer of slot machines and gaming equipment. Sodak Gaming Supplies, Inc. (Sodak) is a licensed distributor of IGT's slot machines and gaming equipment. Together, IGT/Sodak perform the monitoring, accounting, collection and disbursement function for Quartermania. They bill each participating slot machine operator a monthly charge of $85.00 for telephone service and computer time plus 6% of the total coins played in each machine. The 6% funds potential jackpots, which are placed in reserve accounts by IGT, and also pays for the services of Sodak/IGT.

ARSD 20:18:17:24.14 became effective on July 1, 1990. On July 7, 1990, Black Hills Novelty (Black Hills), a licensed operator which owns "Treasury Link," another progressive slot machine system in Deadwood, filed a petition with the Gaming Commission requesting repeal of ARSD 20:18:17:24.14. Black Hills claimed the rule violated the law by permitting distributors and manufacturers to perform the audit and security functions reserved to operators of slot machines. IGT was granted permission to intervene in the Gaming Commission action. The Gaming Commission denied the request for repeal of the rule.

Black Hills then filed both an appeal of the Gaming Commission's ruling and a declaratory judgment action in circuit court, requesting the court find the rule unconstitutional as exceeding the authority of the Gaming Commission. By acquiescence of the parties, appeal of the Gaming Commission's ruling was stayed pending the outcome of the declaratory judgment action.

Agreeing there were no factual issues involved, Black Hills and IGT/Sodak filed cross-motions for summary judgment in the declaratory judgment action. On January 12, 1993, the trial court found ARSD 20:18:17:24.14 was an invalid and unconstitutional exercise of legislative power by the Gaming Commission and entered summary judgment for Black Hills. This appeal followed.

## STANDARD OF REVIEW

■ In declaratory judgment actions, this Court "has an obligation to reach its legal conclusions independent from the conclusions reached by the trial court." *Northwestern Bell Telephone v. Stofferahn,* 461 N.W.2d 129, 134 (S.D.1990). Thus, we review these questions of law de novo. *In re SDDS, Inc.,* 472 N.W.2d 502, 507 (S.D.1992); *Permann v. Department of Labor,* 411 N.W.2d 113, 117 (S.D.1987).

## DECISION

I. *Neither Res Judicata Nor Collateral Estoppel Bar This Appeal.*

■ Sodak/IGT first assert this action is barred by the res judicata effect of the Gam-

ing Commission's ruling. Although collateral estoppel was raised by pleadings to the circuit court, the legal theories of res judicata and collateral estoppel are not synonymous. *Merchants State Bank v. Light,* 458 N.W.2d 792 (S.D.1990). Because the issue of res judicata was not raised below, it was waived and will not be considered for the first time on appeal. *Fullmer v. State Farm Ins. Co.,* 498 N.W.2d 357, 360 (S.D.1993); *Mash v. Cutler,* 488 N.W.2d 642, 648 (S.D.1992).

■ For the doctrine of collateral estoppel to apply, four tests must be met:

(1) Was the issue decided in the prior adjudication identical with the one presented in the action in question?

(2) Was there a final judgment on the merits?

(3) Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?

(4) Did the party against whom the plea is asserted have a full and fair opportunity to litigate the issue in the prior adjudication?

*Staab v. Cameron,* 351 N.W.2d 463, 465 (S.D. 1984). The appeal of the Gaming Commission's ruling means there was no final adjudication on the merits. Therefore, collateral estoppel does not bar this appeal.

II. *The Gaming Commission Did Not Unconstitutionally Exceed Its Authority In Promulgating ARSD 20:18:17:24.14.*

■ The trial court found that ARSD 20:18:17:24.14 violated sections of SDCL ch.

42–7B by unlawfully permitting slot machine manufacturers and distributors to perform functions statutorily reserved to operators and retailers. This resulted in a declaratory judgment holding the rule was an unconstitutional and invalid exercise of legislative power by the Gaming Commission and an order granting summary judgment for Black Hills. *See Matter of Application No. 5189–3,* 467 N.W.2d 907 (S.D.1991). We disagree with the trial court.

Article III, § 1 of the South Dakota Constitution grants the legislature the power to enact laws. It is settled law that the legislature may delegate quasi-legislative duties to administrative agencies "so long as the applicable statute promulgates a legislative policy and outlines the standard to be followed in its execution." *Utah Idaho Sugar Co. v. Temmey,* 68 S.D. 623, 630, 5 N.W.2d 486, 489 (1942); *Oahe Conservancy Subdistrict v. Janklow,* 308 N.W.2d 559, 563 (S.D.1981). The legislature delineated the standard to be followed in SDCL 42–7B–2.1.[1]

Under the authority granted by SDCL 42–7B–7[2], the Gaming Commission utilized its rulemaking power to enact the questioned regulation, ARSD 20:18:17:24.14, which provides:

A licensed manufacturer or distributor may supply a licensed operator with a communications service that would interlink progressive slot machines and related equipment in the city of Deadwood, or any other location in South Dakota authorized

---

1. SDCL 42–7B–2.1. provides in part:

The Legislature hereby finds, and declares to be the public policy of this state, that:
(1) The success of gaming is dependent upon public confidence and trust that licensed gaming is conducted honestly and competitively, that the rights of the creditors of licensees are protected and that gaming is free from criminal and corruptive elements;
(2) Public confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments and the manufacture or distribution of gaming devices and equipment;
(3) All establishments where gaming is conducted and where gambling devices are operated, and manufacturers, sellers and distributors of certain gambling devices and equip-

ment must therefore be licensed, controlled and assisted to protect the public health, safety, morals, good order and the general welfare of the inhabitants of the state, to foster the stability and success of gaming and to preserve the economy and policies of free competition of the state of South Dakota[.]

2. SDCL 42–7B–7 provides, in relevant part:

The commission may promulgate rules for the orderly transaction and conduct of its business and the substantive rules that it may determine proper concerning the issuance, revocation and suspension of gaming licensees, the division of machines or card games that may be placed in any building or retail business, the conduct and operation of limited card games and slot machines, and any other things necessary to carry out the purposes of this chapter.

by law, and may manage and monitor the accounting, collection, and disbursement of progressive payouts. The system must be approved by the commission.

South Dakota law prohibits a slot machine manufacturer or distributor from being licensed as an operator or retailer:

(1) Slot machine manufacturer or distributor. The license fee is one thousand dollars and thereafter an annual fee renewable July first of each year in the sum of two hundred fifty dollars. *A slot machine manufacturer or distributor may not be licensed as an operator or retailer* [.]

SDCL 42–7B–22(1) (emphasis added).

A slot machine operator is defined by statute:

(16) "Operator," any person who places slot machines upon his own business premises or any person who, individually or jointly pursuant to an agreement whereby consideration is paid for the right to place slot machines or gaming tables, *engages in the business of placing and operating slot machines or gaming tables within the city of Deadwood* [.]

SDCL 42–7B–4(16) (emphasis added).

■ SDCL 42–7B–4(16) was enacted in the conjunctive; therefore, to be defined as an "operator" under the statute, an entity must both "place" *and* "operate" slot machines. *Norgeot v. State*, 334 N.W.2d 501, 504 (S.D.1983) ("We cannot replace the plain language of the statute with an interpretation which would turn a conjunctive phrase into a disjunctive one. We simply must take the legislative enactment at face value."); *Weber v. South Dakota Dep't of Labor*, 323 N.W.2d 117, 120 (S.D.1982) (stating all three elements of a conjunctive test must be met for statute to apply).

3. SDCL 42–7B–17 provides:

Any operator is responsible to provide audit and security measures relating to slot machines, as prescribed by this chapter and the commission. The operator shall insure slot machine specifications comply with those set forth in this chapter and the rules of the commission.

4. ARSD 20:18 appx. A Administrative—Organization and Structure § 110.1 provides:

■ First, Sodak/IGT are not "placing" slot machines in gambling establishments. They are not "paid for the right to place slot machines ... within the city of Deadwood," but for providing slot machine operators with telecommunications and special accounting and security services associated with the Quartermania system.

Nor are Sodak/IGT "operating" slot machines in establishments. Operators of slot machines are required by statute and administrative regulations to perform certain mandatory tasks. These duties include maintaining slot machines in proper working order, securing access to the interior of the machines, performing slot machine drop and fill procedures, recording slot machine meter readings, preparing accounting reports, and reporting and remitting gaming taxes and fees. SDCL 42–7B–23, –28; *see generally* ARSD 20:18:17–20:18:22. The record shows no evidence that these functions are being performed by Sodak/IGT. Therefore, they are not operators as defined by statute and administrative regulation. Because Sodak/IGT do not fit the statutory definition of "placing and operating" slot machines, they are not operators as defined by statute.

■ Second, Sodak/IGT do not become operators by performing audit and security functions which operators may delegate under both statute and administrative regulations. Under SDCL 42–7B–17 [3], an operator is legally responsible to "provide" audit and security measures. There is nothing in the law which prohibits an operator from delegating the performance of these functions to someone else. In fact, the Gaming Internal Control and Revenue Reporting Manual expressly provides that an operator's duties and functions may be delegated in accord with the law.[4] However, the operator retains

The Owner/Operator is _____ (name), and is responsible for operations of the entire property; attainment of long-term growth; *delegates portions of his duties and responsibilities to appropriate management personnel;* determines that all operations and activities are conducted in accordance with Company policy and applicable state and federal law; has the authority to hire and terminate departmental personnel. All owner/operators

legal responsibility for the audit and security functions required under SDCL 42–7B–17.

Further, the audit and security functions provided by Sodak/IGT for the Quartermania system are in addition to the obligations imposed on the operators or retailers of all non-progressive machines. Black Hills admits this by stating "IGT/Sodak perform an audit function that no single licensed operator in the system can either provide or perform." Where the management functions performed are in addition to those required of operators by law, and could not even be performed by individual operators, Sodak/IGT are clearly not transformed into operators by supplying those audit and security services.

■ Third, the fact that Sodak/IGT are paid a percentage of the coin drop rather than a flat fee for services does not convert them into operators. The money paid is a business expense for services provided, not consideration paid for the right to place slot machines. The progressive controller must continuously monitor each connected machine for inserted coins and must multiply the number of coins by the rate of progression in order to determine the correct amount to apply to the progressive jackpot. Therefore, the monitoring and calculation services provided by Sodak/IGT are directly dependent on the number of coins played in a particular machine. The percentage of the coin drop paid to Sodak/IGT is a business expense calculated on use, not a percentage of profits from the machines. *Accord* SDCL 42–7A–24 (defining net proceeds as funds not needed for the payment of prizes, lottery expenses and for replacement, maintenance and upgrade of business systems, product development, legal and operating contingencies).

In enacting ARSD 20:18:17:24.14 the Gaming Commission did not exceed its rulemaking power under SDCL 42–7B–7 and thereby violate Article III, § 1, of the South Dakota Constitution. We reverse the summary judgment granted to Black Hills and remand to the circuit court with instructions to enter summary judgment for Sodak/IGT.

must be licensed [sic] as such with the South

WUEST, J., and TUCKER, Circuit Judge, concur.

HENDERSON and SABERS, JJ., dissent.

TUCKER, Circuit Judge, sitting for AMUNDSON, J., disqualified.

HENDERSON, Justice, (dissenting).

This is another gambling case which has reached the highest court of this state. I would affirm the decision of the circuit court.

Although I agree with the majority's determination that Sodak/IGT are not operators or retailers, unconstitutionality need not be based on a finding that they *are* operators or retailers; rather, their performance of operator-functions alone violates the statutory split between operator/retailer and manufacturer/distributor. The majority disagreed with the trial court's ruling that ARSD 20:18:17:24.14 violated sections of SDCL ch. 42–7B by unlawfully permitting slot machine manufacturers and distributors to perform functions statutorily reserved to operators and retailers. Thus, I respectfully dissent.

Per SDCL 42–7B–4(16), an operator is defined as:

> any person who places slot machines upon his own business premises or any person who, individually or jointly pursuant to an agreement whereby consideration is paid for the right to place slot machines or gaming tables, engages in the business of placing and operating slot machines or gaming tables within the city of Deadwood[.]

This statute does not stand alone. *Border States Paving, Inc. v. Dept. of Revenue*, 437 N.W.2d 872, 874 (S.D.1989). We must read on. The Legislature further clarified the responsibilities of operators under SDCL 42–7B–17:

> **Any operator is responsible to provide audit and security measures relating to slot machines**, as prescribed by this chapter and the commission. The operator shall insure slot machine specifications comply with those set forth in this chapter and the rules of the commission. [Emphasis added.]

Dakota Commission on Gaming.

These statutes, plus SDCL 42–7B–22(1) which prohibits a slot machine manufacturer or distributor from being licensed as an operator or retailer, reveal a clear intention by the South Dakota Legislature to separate (a) those who profit from manufacturing and distribution from (b) those who, as operators and retailers, depend upon the play of the machines for profit.

With this in mind, let us examine the relationship between Sodak/IGT and Quartermania operators. Sodak is the exclusive distributor of IGT gaming equipment in South Dakota. Together, Sodak/IGT offer communication and management services, including some audit and security functions for Quartermania operators. Additionally, Quartermania's central computer generates weekly invoices stating the amount the operator owes for Quartermania services. The amount is based on the total coins played per machine for the week, multiplied by 6%. Sodak/IGT then receives a percentage of the take. Quite literally, manufacturers and distributors improperly depend upon the play of the machine to make a profit under this system.

Sodak/IGT perform auditing and security tasks—functions which are the operator's responsibility as the language of SDCL 42–7B–17 mandates. *Aman v. Edmunds Cent. School Dist.*, 494 N.W.2d 198, 199 (S.D.1992); *Appeal of AT & T Info. Sys.*, 405 N.W.2d 24, 27 (S.D.1987). This fact is uncontroverted. The law permits an operator to delegate the performance of these functions to someone else, providing the operator remains legally responsible for these obligations. However, as SDCL 42–7B–22(1) plainly indicates, when it comes to manufacturers and operators, never the twain shall meet. As the "reasonable natural and practical meaning, as intended by the Legislature" indicates, *In re Sioux Valley Hospital Ass'n*, 513 N.W.2d 562 (S.D.1994) (citing *Norgeot v. State*, 334 N.W.2d 501, 503 (S.D.1983)), via SDCL 42–7B–17 and 42–7B–22(1), an operator may indeed delegate these responsibilities, but the same statutes disqualify manufacturers and distributors from such delegation.

When South Dakota voters approved of gaming in Deadwood, they did so with an intent that Deadwood gambling casinos be operated under restrictions and strict control. For example, part of that control includes betting limits, which voters reinforced in the September 4, 1993 statewide special election by rejecting a proposed increase in said limits. The people of South Dakota are the source of authority and their intentions should be honored. Regulation over who can do what is also found in SDCL chap. 42–7B. Control is reflected by public policy statements found in SDCL 42–7B–2.1:

(1) The success of gaming is dependent upon public confidence and trust that licensed gaming is conducted honestly and competitively, that the rights of the creditors of licensees are protected and that gaming is free from criminal and corruptive elements;

(2) *Public confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments and the manufacture or distribution of gaming devices and equipment* [.] [Emphasis added.]

Sodak/IGT is not being paid a flat fee for these services, but a percentage of the drop. Once the slot machines have been sold, the manufacturer or distributor is supposed to lose financial interest in the slot machines. Under the majority decision, that does not happen.

The statutes cited herein envision a separation, but the questioned rule has assimilated operators and manufacturers/distributors into one. This opens a window for potential corruption while eliminating supervision. We should not countenance such a rule. Nor do I intend to insinuate any improper behavior on behalf of the operators or Sodak/IGT; rather, public policy and statutes demand that we lessen the temptation for such. Although operators are not prohibited from delegating their responsibilities, those responsibilities cannot be delegated to manufacturers or distributors. The task must be delegated elsewhere.

ARSD 20:18:17:24.14 is an *administrative regulation* birthed by the South Dakota Gaming Commission and unlawfully permits

slot machine manufacturers and distributors to perform certain functions statutorily reserved to operators and retailers, an unconstitutional and invalid exercise of legislative power by the Gaming Commission. *See Matter of Application No. 5189–3*, 467 N.W.2d 907 (S.D.1991). Sodak/IGT are not, in fact, "operators"; rather, Sodak/IGT perform operator-functions that manufacturers and distributors are prohibited from performing. Hence, Sodak/IGT need not "place" or "operate" slot machines to *act* as operators. By enacting the rule in question, the Gaming Commission stepped beyond its legislative authority and violated Art. III, § 1 of the South Dakota Constitution. *See Matter of Ackerson, Karlen & Schmitt*, 335 N.W.2d 342 (S.D.1983). The people's will has been subserved and frustrated.

I am authorized to state that Justice SABERS joins this dissent.